441 So.2d 84 (1983)
Hezekiah EDWARDS
v.
STATE of Mississippi.
No. 53800.
Supreme Court of Mississippi.
March 16, 1983.
Rehearing Denied December 14, 1983.
*85 Stanfield & Holderfield, Percy S. Stanfield, Jr., Merrida P. Coxwell, Jr., Jackson, for appellant.
Bill Allain, Atty. Gen. by Catherine Walker Underwood, Sp. Asst. Atty. Gen., Jackson, for appellee.
En banc.
PRATHER, Justice, for the Court:
Hezekiah Edwards was indicted for capital murder after the shooting death of a Jackson police officer. At the conclusion of the guilt-finding phase of the bifurcated trial, the jury returned a verdict of guilty. Thereafter, the jury also determined that there were two statutory aggravating circumstances which outweighed any mitigating circumstances.[1] Consequently, the jury found that the defendant should suffer the penalty of death. Finally, the lower court judge held that Edwards was an habitual criminal.[2] As a result of these determinations, the Circuit Court for the First Judicial District of Hinds County sentenced Edwards to the penalty of death.
On appeal, Edwards raises four (4) assignments of error as follows:
(1) The jury's verdict was against the overwhelming weight of the law and evidence on the issue of appellant's insanity.
(2) The appellant was denied due process and a fair trial by improper and prejudicial statements made by the District Attorney.
(3) The death penalty constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments.
(4) The appellants' Eighth and Fourteenth Amendment rights were violated by the trial court's granting of statutory instruction (5)(h) contained in section 99-19-101 of the Mississippi Code Annotated (Supp. 1982).

FACTS
On April 13, 1981, around 11:00 p.m., Officers Hickman and Brewer were called by radio to investigate an incident involving an armed man on Lynch Street. The officers then drove their patrol car up to the sidewalk on the 900 block of Lynch Street in front of Alexander's Cafe. When Officer Brewer stopped the car, the officers observed that one black male was sitting on a metal folding chair just inside the door at Alexander's Cafe. As the officers exited their car, the black male said: "I'm the night watchman. I'm just getting some air." Officer Hickman then replied: "Do you have a shotgun in there?" Immediately, the black male stood up as he picked up *86 a shotgun and fired two (2) shots in rapid succession at Officer Hickman.
Both officers responded to the incident by shooting at the black male, injuring him in the shoulder. Meanwhile, Officers Paxton and Iles had arrived on the scene to aid Brewer and Hickman. While Paxton shut the cafe door, Brewer and Isles pulled Hickman into the front entrance of the Old Night Train Lounge.
Hezekiah Edwards walked out of Alexander's Cafe, with his hands raised and his shoulder bloodied. He stated: "Police, don't shoot. The man doing all the shooting just went up through the loft." When the officers searched the cafe, no one else was found and there were no other exits from the cafe. Officer Brewer stated that Edwards was the man who shot Hickman.
Officer Hickman was found dead on arrival at the hospital. In the opinion of Dr. Michael G. Connor, a pathologist who performed the autopsy, the victim lost consciousness within a matter of seconds, and died no later than five (5) minutes after being shot. The autopsy revealed 286 pellet wounds to the hip region and upper back.
Following a motion filed by the State, the circuit court ordered Edwards to be transferred on April 19, 1981 to the Mississippi State Hospital at Whitfield. While there, he was subjected to a battery of psychological tests to resolve any questions concerning his capacity to stand trial and his criminal responsibility under the M'Naghten Rule. On November 10, 1981, the Court also ordered a psychiatrist at the University Medical Center to examine Edwards' mental condition. It was the unanimous conclusion of all of these experts that, while he was definitely suffering several emotional disorders, Edwards knew right from wrong at the time of the murder. [The expert's testimony will be reviewed in detail in the discussion below].

GUILT PHASE

I.
The crucial issue to be resolved in this case is whether the jury verdict on the insanity issue[3] was against the weight of the evidence. For several years, our jurisdiction has chosen to apply the M'Naghten Rule as the basic step in resolving this issue. Laney v. State, 421 So.2d 1216 (Miss. 1982); Harvey v. State, 207 So.2d 108 (Miss. 1968); Cunningham v. State, 56 Miss. 269 (1879). The rule is stated as follows:
[T]o establish a defense on the ground of insanity, it must be clearly proved that, at the time of the committing of the act, the party accused was labouring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong. (R. Perkins, Criminal Law 859 (2d ed. 1969) (quoting from M'Naghten's Case, 10 Clark & F. 200, 210, 8 Eng.Rep. 718, 722 (1843)).
In applying this rule, there is a presumption that the accused is sane; and therefore, the burden is initially on the defendant to introduce evidence creating a reasonable doubt of his sanity. Herron v. State, 287 So.2d 759 (Miss. 1974); Ford v. State, 73 Miss. 734, 19 So. 665 (1896). However, once the defendant has overcome this initial burden, it is the burden of the state to present sufficient evidence to prove the defendant's sanity beyond a reasonable doubt. Lias v. State, 362 So.2d 198 (Miss. 1978); Myrick v. State, 290 So.2d 259 (Miss. 1974). Expert witnesses are frequently used, as well as lay witnesses, to state their *87 opinions of the accused's mental state with regard to the M'Naghten Rule. Such opinions must be based on personal knowledge, and the jury is not bound to accept the conclusions of any expert. Hollins v. State, 340 So.2d 438 (Miss. 1976); Smith v. State, 245 So.2d 583 (Miss. 1971).
In the instant case, there was a great variety of psychological and psychiatric evidence pertaining to Edwards' sanity, including past medical records. The records reflected the appellant's mental history from 1975 through August of 1980.
Beginning chronologically, Edwards was first diagnosed by Dr. James W. Doolos, a psychiatrist, and Dr. Andrew T. Pickens, the staff psychiatrist at the federal penitentiary at Springfield, Missouri. Dr. Pickens' diagnosis of the appellant on March 18, 1975 was "chronic paranoid schizophrenia in partial remission with prominent anxiety features." On June 15, 1976, Dr. Doolos also diagnosed Edwards as suffering from chronic paranoid schizophrenia. While under these doctors' care, Edwards was treated with such drugs as prolixin, cogentin and valium. Edwards was eventually discharged after treatment for two (2) years at the Springfield Medical Center as a chronic schizophrenic in partial remission with medication.
On June 24, 1976, the appellant was examined at the Mississippi State Hospital by Dr. Dave Davidson. His diagnosis was: "This patient with the diagnosis of paranoia schizophrenia does not appear grossly psychotic at the present time... . He's being given a prescription for stelazine ten milligrams twice a day. The prognosis is guarded."
Again in 1980, Doctors Deborah E. Rogers and Mary E. Brown diagnosed Edwards as a paranoid schizophrenic and he was committed to Whitfield pursuant to court order. Edwards had previously been committed to Whitfield in 1966, and he had two other family members who had also been committed there. While at Whitfield on the latter occasion, Dr. Billy Graham, a staff psychiatrist, diagnosed Edwards as suffering from schizophrenia, paranoid type. Dr. Graham treated the appellant with prolixin and also gave a guarded prognosis. Edwards was eventually discharged from Whitfield in 1980. Apparently Edwards left the hospital without permission, but the staff made no effort to bring him back. There was no reason given for the discharge.
The following is an example of the type of feelings the appellant had while voluntarily committed in 1976:
A. Feels that people are out to get him. Tells the story that his brother raped his girl and when his son grew up, they came looking for him. He said his nephews did not  didn't know him from anybody else and he was afraid they might jump on him. He stays scared all the time.
Q. All right. And the attached history from the Federal Prison in Springfield, Missouri was that the inmates were out to kill him, was it not?
A. Right.
Several lay witnesses who knew Edwards also testified that he was indeed "off," "weird," or "crazy." Albert Hill was the individual who alerted others that Edwards was armed and shooting a rifle on Lynch Street. He testified that Edwards told him he was carrying a shotgun because: "Cuz, these niggers been messin over me and I gonna get them." The victim was white.
In contrast to the above evidence, the state offered four (4) expert witnesses who had recently examined the appellant. Each expert testified that in his opinion, Edwards knew the difference between right and wrong and appreciated the nature and quality of his actions at the time of the crime.
Dr. Charlton S. Stanley, a forensic psychologist, performed a battery of psychological examinations on Edwards at the Mississippi State Hospital at Whitfield. Stanley testified that Edwards was administered the Wechsler Adult Intelligence Test, which is a test of intelligence; the Rorschach Ink Blot Technique Test, which is a personality test; the Sentence Completion Form, which is a handwritten personality test; and the Human Figure Drawings Test. Dr. Stanley *88 described appellant's behavior throughout the examination as uncooperative and oppositional. In other words, Edwards deliberately tried to mislead the examiners.
Stanley testified that the Wechsler test revealed Edwards' I.Q. to be 83, a score which is considered to be a little below average but not retarded. The Rorschach Ink Blot Test indicated that Edwards was guarded and cautious, impulsive, immature, self-centered, and an extremely angry and hostile man. In interpreting the results of the Sentence Completion Form, Dr. Stanley commented that the appellant's thoughts were clear and logical, and indicated no delusional beliefs. Stanley added that Edwards' sentences frequently directly contradicted each other, a further indication that Edwards was oppositional. The Human Figure Drawing Test suggested that Edwards identified with children more than adults, that he displayed temper tantrums, and that he was very suspicious.
In Dr. Stanley's opinion, Edwards had a personality disorder professionally known as anti-social type. In laymen's terms, the disorder is frequently called psychopath or criminal personality. Dr. Stanley stated that it was very difficult to be ruled legally insane under the M'Naghten Rule,[4] and concluded that Edwards was nowhere near legally insane. On cross-examination, Stanley admitted that "a person can be legally sane under ... the M'Naghten Rule and still be medically insane or suffering from grave emotional and debilitating disorders." Stanley added that he disagreed with the diagnosis from 1975 through 1980 that indicated paranoid schizophrenia. He stated that Edwards was not suffering from any delusions. Stanley concluded by commenting that even some paranoid schizophrenics can tell the difference between right and wrong.
Dr. Robert L. McKinley, Jr., a psychiatrist, examined Edwards along with Stanley and Dr. Guild, another psychiatrist, at Whitfield. His diagnosis was "paranoid personality with anti-social features and alcohol abuse." Dr. McKinley stated that Edwards definitely knew right from wrong, and he totally disagreed with all former diagnoses that Edwards was schizophrenic. He defined paranoid schizophrenia as a mental illness in which a person has delusions or false beliefs that are patently absurd. McKinley added that many paranoid schizophrenics still know right from wrong. On cross-examination, McKinley acknowledged that Edwards had a long history of hallucinations that people were out to get him. He also admitted that it was a medical probability that the defendant had an automatic remission (without the aid of drugs), and that such a remission could have possibly occurred after the shooting incident and before the psychological examination.
Dr. Donald C. Guild diagnosed the appellant as suffering no psychosis, but that the appellant had a paranoid personality with antisocial features. In other words, Edwards was not suffering from any major mental illness. He defined antisocial features as a repeated conflict with the law, and having no conscience. In Dr. Guild's opinion, Edwards' ("the man doing all the shooting just went up through the loft") statement indicated that he knew that there had been a shooting, that he knew the police were looking for the man who had committed the act, and that he knew to blame someone else. Guild added that placing the blame on someone else indicated an understanding of right and wrong.
Dr. Garfield Tourney, a professor of psychiatry at the University Medical Center, conducted his own individual psychiatric examination and evaluation of Edwards as a result of a court order. His diagnosis of Edwards, conducted on November 12, 1981, was as follows: "alcohol abuse, long standing and chronic; personality disorder  difficulty in getting along with people; probably dull normal to borderline intelligence." On cross-examination, Tourney admitted *89 that, in making the above diagnosis, he was not aware of the appellant's past medical history.
In resolving this dispute, we note that the defendant's medical history indicates that he may be suffering from schizophrenia, but none of the experts treating Edwards from 1975-1980 were concerned with determining his legal sanity under the M'Naghten Rule. In fact, several of the state's expert witnesses indicated that schizophrenics could still tell right from wrong. Moreover, four experts testified that Edwards could distinguish right from wrong when he murdered Hickman. In light of this evidence, it is difficult to challenge the jury's conclusion that Edwards was criminally M'Naghten responsible. We therefore find no error in this first assignment.

II.
The next assignment of error contends that the appellant was denied a fair trial as a result of allegedly improper closing remarks made by the district attorney during the sentencing phase. The district attorney's remarks were as follows:
And that's what your job is today. To decide whether or not this man can shoot a police officer in the back with two loads of shotgun shells and go up there for life imprisonment. And believe me, Mr. Stanfield nor I neither one knows what that means. He said to you that it meant  he said to you in this language: "Life imprisonment is the only answer. Let's send him up there and let him stay up there forever." But he didn't tell you that we're going to do that 
BY MR. STANFIELD: Your Honor, we object to this argument.
BY THE COURT: Overruled.
BY MR. PETERS: All he said was that's the answer. And maybe it is if that were so, but we don't know that that's so.

The doctors have said that the only way to cure this type of person is to get them out of society permanently and Mr. Stanfield has not told you that putting him in life imprisonment is going to keep him up there permanently, even though he would have you to believe that by saying that's the only answer.

BY MR. STANFIELD: I'd like a continuing objection, Your Honor, to this line of argument.
BY THE COURT: Overruled.
In Clemons v. State, 320 So.2d 368 (Miss. 1975), our Court provided a lengthy discussion for guidance in resolving closing argument issues. The Court stated:
So long as counsel in his address to the jury keeps fairly within the evidence and the issues involved, wide latitude of discussion is allowed; but, when he departs entirely from the evidence in his argument, or makes statements intended solely to excite the passions or prejudices of the jury, or makes inflammatory and damaging statements of fact not found in the evidence, the trial judge should intervene to prevent an unfair argument. Moreover, this Court will not withhold a reversal where such statements are so inflammatory [in the judgment of this Court] as to influence the verdict of the jury, and thus prevent a fair trial.
[Emphasis added].
[Id. at 371-72].
According to the capital murder sentencing statute, section 99-19-101 of the Mississippi Code Annotated (Supp. 1982), the decision of whether to sentence the defendant to death is based on a weighing of aggravating and mitigating factors. There is absolutely no valid reason for suggesting to the jury that the defendant will one day be free. However, the analysis does not end there. As suggested by the State's brief, the defendant's counsel invited the district attorney's remarks. During closing, Mr. Stanfield argued:
He admits to being 70, 80 or 90 years of age, but we know that generically, he is 59 years of age. We know from the American Standard Tables  Mortality Tables that his life expectancy will run approximately another eleven years and we know that life imprisonment will never *90 let him see the outside free world again.
It is an old principle that an attorney who invites error cannot complain of it, Wood v. State, 324 So.2d 251 (Miss. 1976); Jackson v. State, 131 So. 411 (1931); Ransom v. State, 149 Miss. 262, 115 So. 208 (1928), and this principle negates any merit that the appellant's contention may have had.

III.
The appellant's third contention is that the death penalty constitutes a per se constitutional violation under any circumstances. This contention is obviously without merit, and needs no further comment. Roberts v. Louisiana, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976); Jurek v. Texas, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).
AFFIRMED AS TO GUILT PHASE.
All Justices concur.

ON SENTENCE PHASE
PER CURIAM:
Hereafter follow opinions regarding the sentence phase only. These opinions evidence a majority vote for vacation of the sentence of death but fail to reflect a majority view on disposition thereafter.
IV.
THE APPELLANT'S EIGHTH AND FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED BY THE TRIAL COURT IN GRANTING TO THE STATE AN AGGRAVATING CIRCUMSTANCE THAT THE CRIME WAS "ESPECIALLY HEINOUS, ATROCIOUS, OR CRUEL" (Mississippi Code, Annotated, Section 99-19-101(5)(h); AND THE EVIDENCE DID NOT SUPPORT THE JURY'S FINDING OF THE STATUTORY AGGRAVATING CIRCUMSTANCES.
BOWLING, Justice, for the majority:
Appellant contends that the facts as applied to the law of the case prohibited the granting by the court of an instruction authorizing the jury to find as an aggravating circumstance in the sentencing phase that "the capital offense was especially heinous, atrocious or cruel." There is a contention, among others, that the court should have gone further and instructed the jury that it was necessary for them to find appellant's act "conscienceless or pitiless ... unnecessarily torturous to the victim," as discussed by this Court in Coleman v. State, 378 So.2d 640 (Miss. 1979). In answering this first contention, the record reveals that there was no request by the appellant for such an extra instruction and he is procedurally barred from raising that issue here. Newell v. State, 308 So.2d 71 (Miss. 1975). Regardless of this procedural bar, we do not find, as hereinafter discussed that the addition of these words was necessary even though they had been requested. In Washington v. State, 361 So.2d 61 (Miss. 1978), we stated as follows:
The facts in no two cases are exactly identical and no precise definition or formula can be made to cover every possible factual situation.
It is our considered opinion that the average jury in its sound discretion and judgment understands the generally accepted meaning of the words "especially heinous, atrocious or cruel" and is able to apply these words to different factual situations without further definition of these words.
It is our opinion that these words are not unconstitutionally vague.
Appellant relies primarily on the case of Godfrey v. Georgia, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). There a plurality of the court reversed the appellant's death sentence stating that the trial court erroneously authorized a jury to find aggravating circumstances under only one statutory provision: that the killing was "outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim." *91 Georgia Code § 27-2534.1(5)(7). It should be noted at the outset that this was the only aggravating circumstance submitted to the jury by the trial court, although the Georgia statute provided for other aggravating circumstances, if applicable. An important distinguishing feature we shall discuss, which was relied on by the plurality when it said:
[T]he jury imposed sentences of death on both of the murder convictions. As to each, the jury specified that the aggravating circumstance they had found beyond a reasonable doubt was that the offense of murder was outrageously or wantonly vile, horrible and inhuman.
The basis of the plurality opinion was that all murders could be said to be outrageous, or wantonly vile, horrible, and inhuman. We clearly do not have a situation in the case sub judice that confronted the widely divided court in Godfrey, supra. The Mississippi statute defining aggravating circumstances to be considered by the jury lists eight in number. In addition to "the capital offense was especially heinous, atrocious or cruel," [MCA § 99-19-101(5) (h), (Supp. 1980)], the court in the case sub judice authorized the jury to find another aggravating circumstance, to-wit: "The capital offense was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws." [MCA § 99-19-101(5)(g) (Supp. 1980)].
The evidence was undisputed that at the time appellant killed the deceased, the latter and his companion were dressed in police uniforms, had driven up in a plainly marked police department vehicle, and the area was lighted. Undisputedly, appellant was in a position to see clearly all of these circumstances.
As previously discussed under Godfrey, supra, the quoted language of the Georgia statute was the "only" aggravating circumstance presented for the jury's consideration. In the case sub judice, we have another equally important aggravating statutory circumstance that the jury not only easily could have found to be present, but would have been manifestly wrong in not considering that circumstance, as it was undisputed.
Appellant relies on the Louisiana Supreme Court case of State v. Sonnier, 402 So.2d 650 (La. 1981). It is noted that the Louisiana Court agreed with the plurality opinion in Godfrey regarding the aggravating circumstance of "especially heinous, atrocious or cruel." The Louisiana Court then went further and affirmed the conviction and death penalty for the reason that, as in the case sub judice, other statutory and aggravating circumstances were presented for the jury's consideration which amply supported the verdict. The Louisiana Court stated:
There was no evidence that the male victim was subjected to any serious physical abuse, and the evidence may not be constitutionally sufficient to support a finding that the female was the victim of torture or the pitiless infliction of unnecessary pain.
However, the evidence was clearly sufficient to support the jury's findings of four out of the five aggravating circumstances it listed. A majority of this Court has held that it knows of no constitutional requirements that a death sentence be vacated whenever the jury errs in only one of its findings of several statutory aggravating circumstances. State v. Monroe, 397 So.2d 1258 (La. 1981). Accordingly, the failure of one aggravating circumstance in this case does not so taint the proceedings as to invalidate the other aggravating circumstances found or the sentence of death.
The Supreme Court of Florida in Peek v. State, 395 So.2d 492 (Fla. 1980), recognized that even though one or more statutory aggravating circumstances were improperly submitted to the jury, the jury could consider other properly submitted aggravating circumstances without requiring a reversal of the case.
Thus, we have two clearly valid aggravating circumstances, one contested but valid aggravating circumstance, and no mitigating circumstances. We find that *92 the trial court's improper consideration of the two aggravating circumstances concerning pecuniary gain and commission of the offense while on probation does not render the sentence invalid.
In our opinion the above discussion regarding Godfrey, supra, as it applies to the case sub judice, is sufficient to affirm on the presently discussed assignment of error. We go further, however, and discuss aggravating circumstances (h), as it applies to the undisputed facts presented the jury during the trial, which record was introduced on the sentencing phase. Upon objection by appellant of the one aggravating circumstance of "especially heinous, atrocious and cruel", the trial court in overruling the objection stated:
Well, I find, in my opinion, the testimony shows that the deceased was shot with a shotgun with No. 6 shots at a distance that it would clearly cover the entire body and it was fired twice, once in one side while the victim was retreating and the second shot, which was the fatal shot, was fired while he was moving away from him. I feel that that is for the jury's consideration.
The undisputed facts are that appellant deliberately aimed the shotgun at the deceased and fired two times in succession. The first blast of the shotgun hit the deceased in the side and the second hit the deceased in the back while he was attempting to retreat. A large number of pellets struck the body of the deceased over both his side and back. The deceased then called to his companion that he had been hit. After these occurrences, the deceased was conscious long enough to fire all six rounds from his .357 Magnum, Smith & Wesson, weapon in the direction of appellant. Certainly, there was a question for the jury as to whether or not deceased suffered physical agony and mental anguish. The testimony was certainly sufficient for the jury to find that the infliction of the wounds was "unnecessarily torturous" and was "pitiless". As stated in Spinkellink v. Wainwright, 578 F.2d 582 (5th Cir.1978), "we feel that the term `especially heinous, atrocious and cruel,' is a matter of common knowledge so that ordinary men would not have to guess at what was intended."
In Godfrey, supra, not only was there just one aggravating circumstance submitted to the jury, there is the additional fact that both of the deceaseds were killed instantly. The crime was committed in the heat of passion, resulting from family difficulties. We find that the plurality opinion in Godfrey does not apply to the case sub judice. Even with this clear situation there were a number of dissenting opinions in Godfrey based on the facts of that particular case.
We conclude that under the undisputed evidence in this case, the aggravating circumstance of "especially heinous, atrocious and cruel" was proper. In addition, and as a completely separate and distinct reason, we conclude that even though it had been improper, the fact that another undisputed aggravating circumstance was properly presented for the jury's consideration, requires that the case should be affirmed as to this assignment of error.
WALKER and BROOM, P. JJ., and ROY NOBLE LEE and DAN M. LEE, JJ., join in this Part IV.
PATTERSON, C.J., and HAWKINS, PRATHER and ROBERTSON, JJ., dissent.

V.
HAWKINS, Justice, on sentence review:
Appellate review is ordinarily limited to well defined and circumscribed guidelines. In death penalty cases we have additional duties imposed upon us by statute stretching beyond the usual review.
One of these duties is to consider the punishment, and we have the authority to set the death sentence aside, and remand the case for modification of the sentence to imprisonment for life.
The pertinent portions of Miss. Code Ann. § 99-19-105 (Supp. 1982) read:
§ 99-19-105. Review by supreme court of imposition of death penalty.

*93 (1) Whenever the death penalty is imposed, and upon the judgment becoming final in the trial court, the sentence shall be reviewed on the record by the Mississippi Supreme Court.
(2) The Mississippi Supreme Court shall consider the punishment as well as any errors enumerated by way of appeal.
(5) ... In addition to its authority regarding correction of errors, the court, with regard to review of death sentences, shall be authorized to:
(a) Affirm the sentence of death; or
(b) Set the sentence aside and remand the case for modification of the sentence to imprisonment for life.
(6) The sentence review shall be in addition to direct appeal, ...
The evidence in this case is overwhelming, if indeed not without contradiction, that Edwards has a long history of suffering from the mental disease schizophrenia of a paranoid type.
Medically this is defined as:

schizophrenia  the most common type of psychosis, characterized by extensive withdrawal of the individual's interest from other people and the outside world and the investment of it in his own self.
* * * * * *

paranoid s.  schizophrenia characterized predominantly by delusions of persecution and megalomania.
Stedman's Medical Dictionary 1125 (22nd ed. 1972).
The medical definition of this disease is little more than a general description of its symptoms. Medical science has noted this affliction in countless multitudes of cases, yet knowledge of its etiology and cure remain for the most part unknown. Its treatment remains clinical, empirical.
That schizophrenia of a paranoid type is one of the most dangerous types of mental diseases to society is a fact, however, the knowledge of which is not restricted to the medical profession. That a person suffering from this disorder may present a grave danger when loosed upon society is a fact well known to law enforcement agencies as well.[5]
Such a person is mentally disoriented; he sincerely believes he is being maligned, mistreated, or perhaps in danger of losing his life in totally imaginary ways at the hands of totally innocent people.
That such a person can constitute a serious danger to innocent and unsuspecting people has been demonstrated upon thousands of occasions.
The jury in this case was properly instructed on guilt and found upon disputed issues of fact that Edwards possessed the mental capacity to commit a crime, i.e., that he knew the difference between right and wrong. On his guilt, and bare mental culpability, the issue has been decided adversely to him.
Equally clear is the inescapable fact that Edwards is a seriously and dangerously mentally ill person, an illness for which, insofar as medical science can determine, Edwards himself is blameless.
Although the slaying of this law enforcement officer was as senseless as it was horrible, barbarism would attend our affirming the death penalty. We therefore set the sentence of death aside, and remand the case for modification of the sentence to imprisonment for life.[6] We further hold *94 that the circuit judge correctly determined that Edwards was an habitual criminal and, pursuant to Miss. Code Ann. § 99-19-81 (Supp. 1981), this sentence of life imprisonment would not grant Edwards eligibility for reduction, suspension, parole, or probation for said sentence. See Taylor v. State, 426 So.2d 775, (Miss. 1983).
PATTERSON, C.J., and ROY NOBLE LEE, J., join this part.
PRATHER, Justice, dissenting as to sentencing phase:
I must respectfully dissent from the majority opinion in Part IV. This part involves the appellant's contention that the jury was improperly instructed on the possible aggravating circumstances involved in this case. During the sentencing stage, the jury was requested to determine whether:
1. "The capital offense was committed to disrupt or hinder the lawful exercise of any governmental function or enforcement of laws." [Miss. Code Ann. § 99-19-101(5)(g) (Supp. 1982)].
2. "The capital offense was especially heinous, atrocious, or cruel." [Miss. Code Ann. § 99-19-101(5)(h) (Supp. 1982)].
It is the latter instruction which is the basis of this assignment of error. First, the appellant argues that the judge failed to define the phrase "especially heinous, atrocious, or cruel." Second, the appellant contends that the facts of this case failed that standard. In order to better understand and resolve these questions, it is necessary to review our case law involving the statutory language of "especially heinous, atrocious or cruel."
In Washington v. State, 361 So.2d 61 (Miss. 1978), our statutory language of "especially heinous, atrocious, or cruel" came under constitutional attack on the ground of vagueness. The Court denied the appellant's claim with little, if any serious consideration, and stated:
It is our considered opinion that the average jury in its sound discretion and judgment understands the generally accepted meaning of the words "especially heinous, atrocious or cruel" and is able to apply these words to different factual situations without further definition of these words. (Emphasis added). Id. at 66.
Subsequently, in Coleman v. State, 378 So.2d 640 (Miss. 1979), our Court relied upon Spinkellink v. Wainwright, 578 F.2d 582 (5th Cir.1978). In Spinkellink, the Fifth Circuit was asked to render unconstitutional a Florida sentencing statute containing the same "especially heinous, atrocious or cruel" language as our statute on the ground of vagueness. Before reaching their conclusion, the Fifth Circuit noted that the Florida Supreme Court had construed the statutory language as including "those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies  the conscienceless or pitiless crime which is unnecessarily torturous to the victim." Id. at 611 (quoting from State v. Dixon, 283 So.2d 1, 9 (Fla. 1973)). The Fifth Circuit then held that the language "especially heinous, atrocious or cruel" was not unconstitutionally vague, as construed by the Florida Supreme Court, since "said construction provided adequate guidance to those charged with the duty of recommending or imposing sentences in capital cases." (Emphasis added) Id.
In Coleman, our Court apparently adopted the same Florida Supreme Court interpretation of "especially heinous, atrocious or cruel" with an emphasis on the "conscienceless or pitiless crime which is unnecessarily torturous to the victim" language. 378 So.2d at 648. And, the Fifth Circuit has recently ruled that our adopted construction of the words "especially heinous, atrocious or cruel" now eliminates the risk that the death penalty will be inflicted in an arbitrary and capricious manner. Gray v. Lucas, 685 F.2d 139 (5th Cir.1982).
*95 Finally, our Court last considered the problems involved in the "especially heinous, atrocious or cruel" language in Evans v. State, 422 So.2d 737 (S.Ct.Miss. 1982). First, Justice Lee noted that the facts in Evans probably constituted a murder which was "especially heinous, atrocious or cruel." His opinion states as follows:
In the case sub judice, the victim was forced to kneel on the floor behind the counter with a .38 caliber revolver pointing at his head, he was made to stand up at gunpoint and open the cash register, and again was forced to kneel on the floor with the revolver still pointing at his head. He was physically assaulted by one of the robbers emptying his pockets, all occurring over a short period of time. From those facts, the jury could consider mental torture and aggravation which the victim probably underwent, and to determine whether or not the murder under all the facts and circumstances was especially heinous, atrocious or cruel. Even though it may be said that the facts of the homicide do not pass constitutional muster on the aggravating circumstance of being especially heinous, atrocious or cruel, three (3) other aggravating circumstances were proved by overwhelming evidence. (Emphasis added). [422 So.2d at 743].
Second, the Court's opinion rejected Evans' offered jury instruction D-4. The requested instruction stated:
Instruction D-4:
The Court instructs the Jury that the terms heinous, atrocious, and cruel are deemed to include those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies in that it involved the conscienceless or pitiless crime which is unnecessarily torturous to the victim. If you find from the evidence that the victim died a quick death without unnecessary pain and torture, then, though the crime is murder, it is not to be considered as especially heinous, atrocious or cruel. [422 So.2d at 745].
In the Court's opinion, this instruction was regarded as "too restrictive." No further comment was given.
With this background in mind, we may now consider the appellant's contentions. The first question requires a consideration of whether or not a jury should be instructed on the meaning of "especially heinous, atrocious or cruel" as interpreted by this Court in the Coleman case.
In Godfrey v. Georgia, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), the United States Supreme Court mandated that states "must channel the sentencer's discretion by clear and objective standards that provide specific and detailed guidance, and that make rationally reviewable the process for imposing a sentence of death." 446 U.S. at 428, 100 S.Ct. at 1764. Thus, the Court held invalid a Georgia sentencing procedure because juries were not instructed as to the meaning of Georgia's statutory language. ("outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim") That conclusion was not surprising since the Court had previously commented on the instructing of juries in Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), as follows:
Since the members of a jury will have had little, if any, previous experience in sentencing, they are unlikely to be skilled in dealing with the information they are given... . It is quite simply a hallmark of our legal system that juries be adequately guided in their deliberations. [428 U.S. at 192-93, 96 S.Ct. at 2934].
These United States Supreme Court opinions offer guidance to the cause sub judice. The Louisiana Supreme Court, in interpreting Godfrey, has decided that its Court "should require that juries considering whether to impose the death penalty on the basis of this aggravating circumstance [especially heinous, atrocious or cruel] must be instructed on the proper, narrow construction of the statute. (Emphasis added). State v. Sonnier, 402 So.2d 650, 659 (La. 1981).
*96 We should adopt the same jury instruction requirement as stated in Sonnier and mandated by Godfrey. It is obvious that the average juror does not know our own narrow construction of the words "especially heinous, atrocious or cruel." Indeed, other states use the same statutory language, and yet, have different interpretations of the language. See, e.g. State v. Poland, 645 P.2d 784, 132 Ariz. 269 (1982) (heinous means hatefully or shockingly evil; cruel means disposed to inflict pain in a vindictive or sadistic manner); Sonnier, supra (for jury to find that murder was especially heinous, atrocious or cruel requires a finding of torture or the pitiless infliction of unnecessary pain on the victim); Maggard v. State, 399 So.2d 973 (Fla. 1981) (heinous means "extremely wicked or shockingly evil"; atrocious means "wicked and vile"; and cruel means "infliction of a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others.")
There is also merit to the appellant's second question. He contends that the facts of this case fail to pass our Court's definition of "especially heinous, atrocious or cruel." In comparing various murders, we must recognize that the United States Supreme Court requires that each state provide rational criteria for distinguishing a case in which the death penalty is to be imposed from the many cases in which it is not. Godfrey, supra, 100 S.Ct. at 1767, 64 L.Ed.2d at 409. If our Court had some doubt as to whether the murder in the Evans case was especially heinous, atrocious or cruel (victim was subjected to emotional torture) then surely the facts of this case are even more questionable. In the opinion of the pathologist who performed the autopsy, Officer Hickman lost consciousness within a matter of seconds, and died no later than five minutes after being shot. And, there was no evidence of physical or emotional torture. If this murder constitutes an especially heinous, atrocious or cruel murder, then, this Court will be hard pressed to find a murder which is not especially heinous, atrocious or cruel. In other words, the majority of this Court is ignoring the Godfrey requirement stated above.
Finally, I must address the majority's construction of section 99-19-101 of the Mississippi Code Annotated (Supp. 1982). The majority opinion in Part IV seems to suggest that even if the murder was not especially heinous, atrocious or cruel, the death penalty must still be imposed if another aggravating circumstance is found to exist by the jury. That is wrong. The statute specifically provides that the jury is to weigh the aggravating circumstances against the mitigating circumstances. Id. at § 99-19-101(2)(b). In this case, the jury should have weighed the aggravating circumstances of disrupting the enforcement of laws against the mitigating circumstances of the appellant's psychological background. See § 99-19-101(6)(b) (offense was committed while defendant was under the influence of extreme mental or emotional disturbance) and § 99-19-101(6)(f) (capacity of defendant to appreciate the criminality of his conduct or to conform his conduct to requirements of law was substantially impaired).
I would reverse the case and remand for a new sentencing trial to be conducted with properly instructed jurors.
PATTERSON, C.J., and HAWKINS and ROBERTSON, JJ., concur.
ROBERTSON, Justice, on sentence phase:
As explained fully in Judge Prather's opinion for a unanimous court at the guilt phase, there was substantial evidence at trial that Edwards was legally sane at the time of the crime in question. That evidence is judged under the familiar right-and-wrong test, which this Court has repeatedly reaffirmed. See, e.g., Harvey v. State, 207 So.2d 108 (Miss. 1968); Hill v. State, 339 So.2d 1382 (Miss. 1976); and Laney v. State, 421 So.2d 1216 (Miss. 1982). Nothing said below should be taken to suggest that we in any way modify or retreat from the applicability of that test for criminal responsibility at the guilt phase of a capital murder trial. Suffice it to say that here there was substantial evidence to support *97 the verdict of the jury finding that Edwards was M'Naghten[7] sane and guilty of capital murder.
At sentencing we have a different matter. The question of mental disturbance is judged by different standards. Rather than employing the right-and-wrong test (which, we repeat, remains fully applicable on the question of guilt or innocence), the Legislature of the State of Mississippi has mandated two different tests or standards. First, if the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance, that is a mitigating circumstance. Miss. Code Ann. § 99-19-101(6)(b) (Supp. 1982). Second, if at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law were substantially impaired, that, too, is a mitigating circumstance. Miss. Code Ann. § 99-19-101(6)(f). The first part of the standard in sub-section (f), i.e., the capacity of the defendant to appreciate the criminality of his conduct, the so-called cognitive test, is essentially the same as the right-and-wrong test. The second part of the test in sub-section (f), however, the volitional test, is quite different as its language indicates.
The experts at trial were in substantial disagreement on the question of whether at the time of the crime Edwards knew the difference between right and wrong. They were unanimous, however, in finding that Edwards was mentally disturbed. Or, forcing the experts' testimony into the words of the statute, we find them of the unanimous opinion that at the time of the offense Edwards was under extreme mental or emotional disturbance and that his capacity to conform his conduct to the requirements of law was substantially impaired.[8] In this state of the evidence at the sentencing phase, the circuit judge should have instructed the jury peremptorily that these two mitigating circumstances existed in this case, to wit:
(1) The offense was committed while the defendant, Hezekiah Edwards, was under the influence of extreme mental or emotional disturbance, and
(2) At the time the offense was committed, the capacity of the defendant, Hezekiah Edwards, to conform his conduct to the requirements of law was substantially impaired.
Up to a point, our conclusion here is consistent with that view of the facts expressed by Judge Hawkins. Lumping together the two mitigating circumstances found here, we agree with Judge Hawkins that there was no credible evidence in the record which would support any view other than that the defendant, Hezekiah Edwards, was seriously mentally disturbed at the time of his crime.
Our disagreement with Judge Hawkins' opinion is based upon our understanding that the act of the legislature precludes undisputed mental disturbance being outcome determinative. To be sure, the legislature has in section 99-19-101(6) prescribed that mental disturbance is a mitigating circumstance to be considered by the jury. But it is only one mitigating circumstance, to be considered together with other mitigating circumstances, and to be balanced and weighed against the aggravating circumstances, according to the procedure elaborated in Sections 99-19-101, et seq., generally. Whatever the law may have been prior to the enactment of our capital murder statute, since April 13, 1977, the fact that one convicted of a capital crime was at the time of his offense mentally disturbed (though not M'Naghten insane) is only one factor to be weighed and balanced. If its discretion is guided by otherwise proper *98 instructions, the jury by statute has been given the power to find that the aggravating circumstance or circumstances proved outweigh this (and other) mitigating circumstances and that the defendant should suffer the penalty of death.
It has been suggested that, to be consistent, we should on remand direct that the court instruct the jury peremptorily that certain aggravating circumstances likewise exist. For two reasons, we do not adopt this suggestion. First, and perhaps technically, our opinion here is concerned only with errors in the proceedings at the sentencing phase requiring reversal. Inasmuch as Edwards was sentenced to die, any failure to instruct the jury that certain aggravating circumstances exists is surely not an error requiring reversal. Besides, in the trial below the jury expressly found to exist the aggravating circumstances suggested. Second, and perhaps more fundamentally, giving peremptory instructions in favor of the state on anything is wholly foreign to the criminal constitutional procedural jurisprudence of this country. For example, there is no such thing as a directed verdict of guilty at a criminal trial. Recognizing that human frailty necessarily infects our criminal law and its processes, jury nullification is a power the founding fathers wisely built into our system. No matter how overwhelming the state's proof, no matter how weak the accused's proof, the jury has unreviewable power to acquit. This is as it should be and as it has always been. If this be so in criminal trials generally, and if it be perceived sound, surely the practice should prevail in sentencing trials where the only question is whether or not the defendant shall live or die. At the sentencing phase of a capital murder trial the circuit judge has no constitutional power to direct that the jury find that any aggravating circumstances exists.[9]
Accordingly, we would vacate the sentence of death imposed upon defendant Hezekiah Edwards and remand this case for further proceedings not inconsistent with this opinion and otherwise in conformity with law. If we were speaking for a majority, we would provide that, if the State wished once again to seek imposition of the penalty of death, the circuit court should conduct a new sentencing hearing which conforms generally to the requirements of Sections 99-19-101, et seq. We would further provide that at any such new sentencing hearing both sides start from scratch  it would be impracticable to direct otherwise. If, and only if, the proof on the issue of mental disturbance were substantially the same as at Edwards' first trial, the jury ought to be instructed peremptorily
(A) that the following facts shall be deemed established:
(1) the offense was committed while the defendant, Hezekiah Edwards, was under the influence of extreme mental or emotional disturbance, and
(2) the offense was committed at a time when the capacity of the defendant, Hezekiah Edwards, to conform his conduct to the requirements of law was substantially impaired, and
(B) that under the laws of the State of Mississippi each of these facts is deemed a "mitigating circumstance", that is, a factor militating against imposition of the penalty of death.
Only because a majority of the Court does not join in this opinion, we join in the per curiam judgment of the Court providing and directing that Edwards be sentenced *99 to life imprisonment without eligibility for probation or parole.
PRATHER, J., concurs.
BOWLING, Justice, dissenting as to sentencing reversal:
The opinion of the majority in reversing the jury verdict sentencing appellant to death emphasizes what probably is a fallacy in the judicial disposition of persons contending insanity as a defense to a criminal charge. This appears to be a problem nationwide. Various jurisdictions are meeting it by advocating varying solutions. It is said by some that the handling of the problem in this state comes nearer to being the best solution that has been advanced.
I hasten to say that the law is now, has been for a long time, and should be, that an insane person should not be tried for a crime requiring proof of criminal intent. With deference, that is not what we have held in this case.
In my humble opinion, the majority opinion in reversing the sentence of death and sentencing appellant to life imprisonment, in effect, is saying, "We find as a fact that appellant is insane and we, therefore, place him in the custody of the Department of Corrections for the rest of his life where he will be associated with and in contact with other individuals who received varying sentences and committed varying crimes, violent or nonviolent."
I take note of the majority opinion through Justice Prather under Points I and II of this appeal. The lower court and this Court followed what has been the law of this state for many years; that is, what is known as the M'Naughten Rule. A short statement of that rule is that the insanity issue depends on whether or not at the time of the commission of the crime, the accused knew the difference between right and wrong and knew at that time what he was doing was wrong. This principle was fully explained to the jury, which found both in the guilt and sentencing phase that appellant was sane under the rule at the time the killing was done. As stated in the opinion, a number of psychologists and psychiatrists examined appellant and testified at trial. Appellant's IQ was rated at 83, a score which is considered to be a little below average, but not retarded. The experts introduced by the state testified that appellant was not suffering from any major mental illness. It was practically uncontradicted that whatever existed within appellant's mind was greatly aggravated by appellant's voluntary chronic abuse of alcohol. We have held in cases too many to cite that voluntary abuse of alcohol is not a defense. The jury easily could have reached the conclusion that appellant was, and is in reality, rather clever. At least one psychologist, who examined appellant, stated, as was set out in the opinion of Justice Prather, "Edwards deliberately tried to mislead the examiners."
I agree that this Court should look closely at the records coming here where the jury has imposed the death penalty. I think we have done this and I cannot say that the jury was not fully justified in finding appellant responsible for his actions when he deliberately killed the deceased under the evidence shown in this record. The jury was fully instructed and answered the foregoing statement in the affirmative.
As stated at the beginning, I am completely unable to understand how this Court can now substitute its opinion for that of the jury and make a finding of fact that appellant is an insane person at all times and place that insane person where other people, good or bad, will be exposed to him.
Since writing the above, a separate opinion on the sentencing phase of the trial has been written by Justice Robertson. He recommends that the cause be reversed and remanded for a new trial on the sentencing phase. At the outset, I believe everyone would agree that this would result in a complete new trial involving all the testimony now appearing in the voluminous appeal record as there would be no way to give a jury a clear picture of a cause without such a complete trial.
Mainly, I object to reversing and remanding for a new trial on the sentencing phase *100 for the reasons propounded by Justice Robertson as his opinion would in effect amount to a directed verdict in favor of the appellant on retrial. He would require that the trial judge peremptorily instruct the jury that appellant was entitled to the mitigating circumstance that the killing was done "under the influence of extreme mental or emotional disturbance" and a peremptory instruction that appellant's "capacity to conform his conduct to the requirements of law was substantially impaired."
The apparent fallacy in Justice Robertson's contention is that he is picking out certain parts of the expert and lay testimony for the lower court to peremptorily charge the jury thereon. He is completely overlooking the admission of experts that whatever mental substandards appellant had, the appellant was voluntarily increasing these substandards by alcoholic abuse and difficulty in getting along with people. The majority opinion written by Justice Prather clearly points out the testimony submitted to the court and jury regarding these actions and activities by appellant. The cases are too numerous to cite that a criminal cannot rely on voluntary alcoholic abuse to reduce his exposure to liability for the crime. Certainly this principle also would continue over into the failure to "get along with people."
Another valid criticism of the recommendation of Justice Robertson is that he does not recommend that the jury during the second trial be peremptorily instructed on obvious aggravating circumstances, principally that the killing was committed to disrupt or hinder the lawful enforcement of laws; i.e., the admittedly official duties of a police officer being performed by the deceased at the time he was killed. Why in the name of all common sense would a court not be required to peremptorily instruct a jury on a matter that was admitted by everyone and cannot be disputed and then amend the statute by requiring a peremptory instruction that appellant was "under the influence of extreme mental or emotional disturbance" and that "his capacity to conform his conduct to the requirements of law was substantially impaired." I do not believe that the legislature intended to create such a double standard, even though appellant admittedly had had mental difficulties in the past. Why not add to the judicially amended statute that the "extreme mental or emotional disturbance of appellant was greatly increased by his abuse of alcohol and his difficulty in getting along with people," resulting in the pulling of the trigger that caused the killing of the deceased while on duty.
I certainly do not advocate a retrial of the entire case just so that the trial judge would be forced by our opinion to peremptorily instruct the jury that appellant should not receive the death penalty.
I would affirm the guilt and sentencing phase of the lower court trial.
WALKER and BROOM, P.JJ., and DAN M. LEE, J. join in this dissent.
AS TO THE GUILT PHASE: AFFIRMED: All Justices concur.
AS TO THE SENTENCE PHASE:
To Affirm: WALKER and BROOM, P.JJ., and BOWLING and DAN M. LEE, JJ.
To reverse and remand: for imposition of life sentence without probation or parole: PATTERSON, C.J., and ROY NOBLE LEE and HAWKINS, JJ.
To reverse and remand for new sentencing hearing: PRATHER and ROBERTSON, JJ.
On the authority of the several opinions, the sentence of death imposed upon the defendant, Hezekiah Edwards, is vacated.[10]
*101 PATTERSON, C.J., and ROY NOBLE LEE, HAWKINS, PRATHER and ROBERTSON, JJ., concur.
WALKER and BROOM, P.JJ., and BOWLING and DAN M. LEE, JJ., dissent.
This cause is remanded to the Circuit Court for the First Judicial District of Hinds County, Mississippi, with instructions that Hezekiah Edwards, as an habitual offender within the meaning of Mississippi Code Annotated section 99-19-83 (1972), as amended, be sentenced to life imprisonment without eligibility for probation or parole.
AFFIRMED ON GUILT PHASE; REVERSED AND REMANDED ON SENTENCING PHASE ONLY FOR IMPOSITION OF LIFE SENTENCE WITHOUT ELIGIBILITY FOR PROBATION OR PAROLE.
NOTES
[1] The jury specifically found that: (1) The capital offense was committed to disrupt or hinder the enforcement of laws and (2) the capital murder was especially heinous, atrocious and cruel.
[2] The defendant was convicted and sentenced to serve a term of one year for the crime of grand larceny on December 12, 1940. He was also convicted and sentenced for the crime of burglary on April 4, 1960.
[3] any person shall be indicted for an offense and acquitted on the ground of insanity the jury rendering the verdict shall state therein such ground and whether the accused has since been restored to his reason, and whether he be dangerous to the community. And if the jury certify that such person is still insane and dangerous the judge shall order him to be conveyed to and confined in one of the state asylums for the insane. [Miss. Code Ann. § 99-13-7 (1972)].
A mental patient seeking release from such confinement by habeas corpus assumes the burden of proof that he has recovered his sanity and is no longer likely to cause harm to himself or others. Bethany v. Stubbs, 393 So.2d 1351 (Miss. 1981).
[4] The M'Naghten rule "directs jurors to hold responsible a great many persons who are seriously disturbed and makes successful assertion of the insanity defense virtually impossible." A. Goldstein, The Insanity Defense 49 (1967).
[5] In oral argument the state's attorney readily agreed to this observation, and expressed shock, given Edwards' history, that he had ever been released from the state mental hospital.
[6] It should also be noted that in the sentencing phase of a capital murder trial two of the mitigating circumstances to be considered by the jury are:

The offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.
* * * * * *
The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.
Miss. Code Ann. § 99-19-101(6)(b), (f) (Supp. 1982).
In our view the sentencing jury failed to give adequate consideration to these two circumstances so dramatically clear from the evidence in this record.
[7] See M'Naghten's Case, 10 Cl. & F. 200, 8 Eng. Reprint 718 (House of Lords, 1843).
[8] That there was also evidence suggesting that whatever mental disturbances Edwards may have experienced were enhanced by his voluntary alcohol abuse does not alter what we have said above. Edwards' alcoholism, voluntary or not, does not change what is in our view the unanimous opinion of the experts that at the time of his offense Edwards was seriously mentally disturbed.
[9] We note that, quite frequently, in capital murder trials in this state the sentencing phase begins with one aggravating circumstance established, i.e., the commission of the offense while the defendant was engaged in the commission of an underlying felony. In such cases, the nature of our capital murder statute is such that the jury has already found as a fact that this one aggravating circumstance exists. See Miss. Code Ann. §§ 97-3-19(2)(e) and 99-19-101(5)(d) (Supp. 1982). In these cases the defendant enters the sentencing phase with the deck already stacked against him. Still, the trial court's sole and only power at sentencing to instruct the jury that this aggravating circumstance exists derives from the fact that it has been so found by the jury at the guilt phase.
[10] A lower court decision may be reversed by a majority of Supreme Court Judges even though their conclusions are based on different issues. Aetna Ins. Co. v. Robertson, 131 Miss. 343, 95 So. 137 (1923); Browning v. State, 33 Miss. 47 (1857).