[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 475 
Johnny Rufus Lanier was convicted of capital murder, and sentenced to death by lethal injection, by the Circuit Court of Covington County. Lanier appeals this verdict and sentence, assigning fourteen errors. After meticulous review of the record, we affirm as to the guilty verdict and reverse and remand for a new sentencing hearing.
 FACTS
In the early morning hours of December 28, 1985, the Meridian, Mississippi Police Department received a domestic disturbance call from Catherine Smith. Smith indicated that she had become embroiled in a quarrel with her live-in companion, Johnny Rufus Lanier, and that he shoved or pushed her out of her house.
As a result of Smith's call, the Meridian Police Department dispatched Officer Alma Walters to the scene. Upon arrival, Officer Walters was met by Ms. Smith who indicated that Lanier was in a bedroom in the house. Officer Walters and Ms. Smith went into the house where they found Lanier passed out on a bed. Officer Walters awakened Lanier and told him to step outside to get some fresh air. Once outside, Officer Walters and Lanier became involved in an argument, and a scuffle ensued, in which Lanier was able to get Walters' .357 magnum service revolver away from her. Lanier marched Walters back into the house. Catherine Smith went to a telephone to call the police and advise them that Officer Walters was in trouble. Other neighbors who were witnesses to all or part of the incident also called the police. At this juncture two gunshots were heard inside of the house.
Responding to an officer in distress call, Officer K.D. Merchant was the first to arrive on the scene. As he approached the front door of the Smith house he yelled to see if Officer Walters was inside. Officer Walters screamed that Lanier had her gun and for Merchant not to enter the house. Almost immediately thereafter Merchant heard a gunshot within the house. He then radioed for backup and an ambulance. When other units arrived, Merchant and several officers entered the house. There they found Alma Walters' body lying face-up across a coffee table with her head on the corner of the couch. She had one gunshot wound to the head, and after a brief examination was determined to be dead. Her revolver was no where to be found, nor was Johnny Rufus Lanier.
Lanier had left the Smith house via the rear door. He traveled to his brother's residence in Meridian where Lanier told both his brother and his brother's girlfriend that he had just killed a police officer, that the police were after him, and that he needed someone to take him to his mother's house in Toomsuba, Mississippi. Lanier's brother agreed to transport Lanier to Toomsuba; however, en route they encountered a police roadblock and were taken into custody. A search of the automobile produced Officer Walters' service revolver with three "live" rounds and three empty cases in the cylinder.
An autopsy of Officer Walters, combined with an analysis of her revolver and its cartridges revealed that she had died from one "contact" shot to the head which entered behind the left ear and exited in front of the right ear. A "contact" shot is one in which the barrel of the weapon is placed against the skin.
Lanier was indicted, and after Lanier moved for a change of venue from Lauderdale County, tried and convicted of capital murder by the Circuit Court of Covington County. At the sentencing phase of the trial the jury found as aggravating circumstances that the murder was: 1) committed in order to avoid a lawful arrest; 2) committed to disrupt the exercise of the enforcement of laws; 3) especially heinous, atrocious and cruel; the mitigating circumstances were insufficient to outweigh the aggravating circumstances. Lanier was sentenced to death by lethal injection from which he now appeals. We separate this opinion into three parts, to-wit: (I) Guilt/Innocence Phase; (II) Guilt/Innocence *Page 477 
Phase and Sentencing Phase; and (III) Sentencing Phase.
 I. GUILT/INNOCENCE PHASE A. DID THE RACIAL COMPOSITION OF THE JURY VENIRE IN LANIER'S CASE VIOLATE HIS RIGHTS UNDER THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT AND THE IMPARTIAL JURY CLAUSE OF THE SIXTH AMENDMENT?
In the trial below, Lanier made a motion to quash the special venire called on the basis that the population of Covington County was at least forty percent black, and that only eight of the thirty-eight potential jurors remaining after the trial court excused jurors for cause were black. Appellant argues on appeal, as he did at trial, that the composition of the venire (twenty-one percent black) was a violation of the Sixth and Fourteenth Amendments of the United States Constitution.
In support of his motion to quash, Lanier called the Circuit Clerk of Covington County, Maxine Williamson, to testify as to the percentage of blacks residing in the County. Williamson testified as follows:
 Q. Can you tell me what percentage of blacks are in Covington County?
 A. My estimate was forty to sixty — forty-five. I'm not sure. I have no figures on it.
 Q. Okay. Would forty-five be a fair estimate?
 A. I would think so.
Appellant offered no further proof concerning this matter.
The case of Davis v. Zant, 721 F.2d 1478, 1482 (11th Cir. 1983) gives a concise statement of the applicable law pertaining to this assignment of error:
 The prima facie tests for an equal protection claim and a fair-cross-section claim are almost identical. In Castaneda v. Partida, 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977), the Supreme Court summarized the requirements for proving an equal protection violation:
 The first step is to establish that the group is one that is a recognizable, distinct class, . . . . Next, the degree of under representation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors over a significant period of time. . . . Finally, . . . a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing.
 In Duren v. Missouri, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979), the elements of a prima facie violation of the fair-cross-section requirement were set out:
 [T]he defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under representation is due to systematic exclusion of the group in the jury-selection process.
(emphasis added)
Even the most elementary analysis of Lanier's evidence, when measured against the above tests leads us to the conclusion, and we so hold, that the evidence offered by Lanier was totally insufficient to support his claim. There simply was no proof that Covington County's method of drawing veniremen was discriminatory. As the party claiming systematic discrimination in jury selection practices bears the burden of proof, Page v.State, 369 So.2d 757 (Miss. 1979), the assignment of error is without merit.
 B. DID THE PROSECUTORS' FAILURE TO PROVIDE DEFENSE COUNSEL WITH DETECTIVE JOHN NELSON'S NOTES IN DISCOVERY AND THEIR USE OF THE NOTES AT APPELLANT'S TRIAL VIOLATE MISS.UNIF. CRIM.R.CIR.CT.PRAC. 4.06(a)(2) AND CONSTITUTE REVERSIBLE ERROR? *Page 478 
Following his arrest, Lanier was taken to the Meridian Police Station where he was interrogated. There he provided a verbal statement to Detective John Nelson concerning the shooting of Officer Walters. Lanier, however, refused to sign a typewritten copy of the statement. Pursuant to a discovery request made by appellant prior to trial, the State provided Lanier with a copy of the typewritten statement. In the lower court, Detective Nelson testified as to the interrogation and as to the oral statement made by Lanier in the early morning hours of December 28, 1985. As a part of his testimony, Nelson utilized his "follow-up notes" made immediately after the interrogation of Lanier. The notes contained Nelson's observations as to the manner in which Lanier conducted himself during the questioning, particularly the way in which appellant bragged that he had beaten Walters with her nightstick when they were scuffling outside of the Smith house. Nelson's notes were never provided to appellant under his discovery request concerning statements that he had made. Lanier complains on appeal that the State's failure to provide the notes in discovery amounts to reversible error.
During the direct examination of Nelson, the State moved the court to have the notes marked for identification; the request was granted. Questioning of Nelson was resumed, wherein defense counsel made the following statement:
 BY MR. JORDAN:
 Your Honor, while Mr. Wright is questioning the witness could we see the exhibit that's been marked?
 BY THE COURT:
 Yes, sir.
 BY MR. JORDAN:
 We never have seen it.
 BY MR. WRIGHT:
 You've got a copy of it.
 BY MR. JORDAN:
 I don't have a copy of the notes.
 (Mr. Wright shows item to opposing counsel.)
 Questioning of the witness began anew. (id.)
As can be seen, counsel for appellant never objected to the State's use of Nelson's notes. "Where the state seeks to offer into evidence that which it ought to have disclosed pursuant to a discovery request but didn't, it is first incumbent upon the defendant to make timely objection." Nixon v. State,533 So.2d 1078 (Miss. 1987) quoting Box v. State, 437 So.2d 19, 23-24 (Miss. 1983) (concurring opinion); see also Griffin v. State,504 So.2d 186 (Miss. 1987); Gray v. State, 487 So.2d 1304
(Miss. 1986). As no timely objection was made to the introduction of Detective Nelson's notes, appellant's point is meritless.
 C. DID THE TRIAL COURT ERR IN REFUSING TO INSTRUCT THE JURY THAT JOHNNY LANIER'S INTOXICATION AND DRUG USE COULD BE CONSIDERED IN DETERMINING WHETHER HE POSSESSED A SPECIFIC INTENT TO KILL THE VICTIM?
The record reflects that prior to shooting Officer Walters, Lanier had consumed vast quantities of alcohol and drugs. On this basis, defense counsel requested that the jury be instructed to consider Johnny Lanier's intoxication in determining whether he had the specific intent to commit capital murder. The trial court refused to so instruct the jury on the basis that the requested instructions were not the law in this jurisdiction. Indeed, this Court has stated that voluntary intoxication is not a defense to a specific intent crime, such as murder. Lee v. State,403 So.2d 132 (Miss. 1981). The rule, more particularly, has been set forth that, "if a person when sober, is capable of distinguishing right and wrong and voluntarily intoxicates or drugs himself to the extent that he does not know or understand his actions, e.g., steals, robs, or murders, he is responsible and he may be convicted and sentenced for the crime." Smith v. State,445 So.2d 227, 231 (Miss. 1984); see also McDaniel v. State,356 So.2d 1151 (Miss. 1978). The lower court acted properly under this well-settled line of authority. *Page 479 
Lanier further argues that, although the trial court never directly instructed the jury that intoxication would negate specific intent, the State did when in argument it told the jury:
 "You heard all about drugs. Sin ain't sin when good folks take a little pill, smoke a little marijuana. `I really didn't intend to kill that police officer.' I don't buy that and I don't believe you do. A man doesn't take pills and take dope and drink whiskey and not be accountable for what he does. That's just an excuse."
In this context it should be noted that the record is replete with instances where appellant sought to have the jury give weight to the fact that he was intoxicated and on drugs on the night in question. Consequently, the State, in making the above remark, was doing no more than addressing issues previously raised by Lanier, which he may not, on appeal, complain about.Davis v. State, 472 So.2d 428 (Miss. 1985). Consequently, Lanier's argument is without legal foundation.
 D. WAS IT MANIFESTLY AGAINST THE WEIGHT OF THE EVIDENCE FOR THE JURY TO CONCLUDE THAT JOHNNY LANIER INTENDED TO KILL OFFICER WALTERS?
Appellant argues that he should have been granted a new trial due to the fact that his conviction for capital murder was against the weight of the evidence presented in the lower court. Concerning weight of the evidence questions in criminal prosecutions, this Court's often cited rule is that once the jury has returned a verdict of guilty all of the evidence, including that presented by the defendant, must be considered in the light most favorable to the State, and that the State must be given the benefit of all favorable inferences that reasonably may be drawn from the evidence presented. May v. State, 460 So.2d 778 (Miss. 1984); Glass v. State, 278 So.2d 384 (Miss. 1973). Once the jury has returned a verdict of guilty, the defendant may be discharged only if, given the evidence taken in light most favorable to the verdict, no reasonable, hypothetical juror could find beyond a reasonable doubt that the defendant was guilty.Parker v. State, 484 So.2d 1033 (Miss. 1986) citing Pearson v.State, 428 So.2d 1361 (Miss. 1983).
In the present case, as previously discussed under the FACTS
portion of this opinion, Officer Walters was called to the Smith house on a domestic disturbance call. She entered the house with Catherine Smith, where Lanier was found in one of the bedrooms. After awaking Lanier, Lanier and Officer Walters went outside where a fight ensued. Lanier told Ms. Smith, while beating Walters, that "I'm going to kill that bitch." Smith fled the scene. Neighbors observed Lanier march Walters back into the house and two shots were heard. Officer K.D. Merchant arrived on the scene and approached the front door of the house, yelling for Walters. Walters replied that Lanier had her gun and for him not to enter, where upon Merchant heard one shot. When backup units arrived, the house was entered, and Walters' body was found with one wound to the left side of the head.
Later, on the date in question, appellant appeared at his brother's house and told his brother and his brother's girlfriend that he had just killed a police officer. While attempting to flee to Meridian, Lanier and his brother were stopped at a roadblock. Officer Walters' service revolver was found in the automobile in which appellant was traveling.
An autopsy of Walters' body revealed that she died from a "contact" wound entering directly behind the left ear and exiting in front of the right ear. As Walters was right handed this would negate Lanier's testimony and argument that the revolver discharged during a struggle, or that the wound was self-inflicted. A forensic study of Walters' .357 magnum revolver, and its three empty cases revealed that it was this weapon that fired the fatal round. Further, a trace metal detection test done on Lanier's hand revealed the outline of a revolver.
Considering the above evidence in a light most favorable to the jury's guilty verdict, Parker, supra; Pearson, supra, the lower *Page 480 
court correctly refused to grant a new trial. The assignment of error is meritless.
 II. GUILT/INNOCENCE PHASE AND SENTENCING PHASE A. WAS JOHNNY LANIER DENIED THE ASSISTANCE OF AN INDEPENDENT PSYCHIATRIC EXPERT AT THE GUILT/INNOCENCE AND SENTENCING PHASES OF HIS TRIAL IN VIOLATION OF HIS SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS?
Prior to trial, appellant requested and received a psychiatric examination and evaluation to determine his mental condition. The trial court ordered Lanier to be admitted to the Mississippi State Hospital at Whitfield so that his sanity with regard to his ability to assist in his defense at trial as well as his sanity at the time of the charged offense could be determined. As a result of his examination at Whitfield, a diagnostic report was filed with the court which provided as follows:
 Mr. Lanier is a thirty year old man admitted 3/26/86 by order of your court. He is charged with capital murder in the shooting death of a police woman on 12/28/85. Evaluation was requested concerning his competency to stand trial and sanity at the time of the alleged crime.
 Mr. Lanier's evaluation has been completed. He has been interviewed on several occasions and has also undergone psychological testing. We also reviewed the records provided to us by his attorney, including the arrest report and Mr. Lanier's voluntary statement following the crime. The collected information was reviewed this morning in a formal staff conference and Mr. Lanier was examined by several staff members, including two psychiatrists, a neurologist, and two clinical psychologists. It was the staff's unanimous opinion that he is competent to stand trial at this time. He understands the nature of the charge against him and the possible consequence should he be convicted. He can give a relevant account of the circumstances surrounding the crime and he would be able to assist his attorney in preparing a defense.
With regard to criminal responsibility, it was the staff's unanimous opinion that he knew the difference between right and wrong in relation to his actions at the time of the crime. We have seen no evidence of a major mental disorder in this man. He does have a long history of alcohol and drug abuse, and was under the influence of both at the time of the shooting. (emphasis added)
In reading the above report it is noteworthy that it was the unanimous opinion of five medical professionals that Lanier was sane at the time of the charged offense and that he was competent to stand trial and assist in his defense.
Following the completion of the Whitfield evaluation, and prior to trial, Lanier made a "Motion For Private Psychiatric Examination," seeking to be "examined by a privately employed psychologist or psychiatrist at the expense of the State of Mississippi." This motion was denied. Appellant's argument at trial, and now on appeal, is based upon the United States Supreme Court's decision in Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985).
The issue considered in Ake was, when must an indigent defendant be provided with the assistance of a psychiatrist. In answering this question, the Court held as follows:
 We therefore hold that when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial,
the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense. This is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own. Our concern is that the indigent defendant have access to a competent *Page 481 
psychiatrist for the purpose we have discussed, and as in the case of the provision of counsel we leave to the States the decision on how to implement this right. (emphasis added)
470 U.S. at 83, 105 S.Ct. at 1097, 84 L.Ed.2d at 66. Based upon the above rule the capital murder conviction of Ake was reversed.
A review of the facts upon which the Ake decision was based reveals that Ake, prior to trial, was examined in a state facility and found to be a psychotic. Ake was further diagnosed as having chronic paranoid schizophrenia, and as a result he was a danger to society. On this basis, it was determined that Ake was not competent to stand trial. However, through the use of an antipsychotic drug, Thorazine, his condition was stabilized so that the State could proceed with the prosecution of Ake. It should especially be noted that no determination was made concerning Ake's sanity at the time of the charged offense. The case sub judice presents a different situation in that Lanier was found, after a battery of psychiatric tests, to have been sane at the time of the charged offense and was competent to aid in his defense. As previously seen, this was the unanimous determination of not one, but five medical professionals.
Lanier contends that a privately employed psychiatrist should have been provided due to his having hallucinations in the past and acting in a weird manner. In this regard, Ake mandates that a psychiatrist should be provided when sanity will become a "significant factor" at trial. Id. The Whitfield report provides ample facts upon which the lower court could determine that Lanier's sanity would not be a "significant factor". This Court has long held that a trial court's determination as to the need for a psychiatrist's assistance in a criminal defense will not be overturned unless there has been an abuse of discretion.Glenn v. State, 439 So.2d 678, 680 (Miss. 1983); Pilcher v.State, 296 So.2d 682, 688 (Miss. 1974). Under the facts of this case the trial court did not abuse its discretion.
Finally, Ake recognizes that an indigent criminal defendant does not have a constitutional right to a psychiatrist of his personal liking or to receive funds to hire his own; rather he has a right only to a competent one. 470 U.S. at 83, 105 S.Ct. at 1097, 84 L.Ed.2d at 66. As Lanier received an evaluation by five medical professionals, including two psychiatrists, the assignment of error is without merit.
 B. DID THE STATE'S MISCONDUCT DURING THE GUILT/INNOCENCE AND SENTENCING PHASES OF JOHNNY LANIER'S TRIAL VIOLATE HIS SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS? 1. DID THE STATE IMPROPERLY INTERJECT RACIAL CONSIDERATIONS INTO THE JURY'S DELIBERATIONS?
Appellant contends that the State, through a series of comments interjected racial considerations into the trial below, and as such Lanier's verdict and sentence should be reversed as being the product of prejudice. Appellant first points to the following remarks, by the prosecution, which he contends are evidence of the interjection of racial prejudice into the sentencing phase:
 She was just doing her duty by answering a call. Let's tell it like it is. We had a — this is a white officer acting in a black neighborhood. She goes out to help them and that used to not be the way it was. Let's just tell it like it is. She went out there to do her job and her duty and she gets her brains blown out. (emphasis added)
 . . . . .
 I want to describe to you and I want to tell you that I think you've heard her testimony because she left the evidence for you and for the law enforcement to find. Contact shot in her head, magnum ports and she went further. She had the courage to give up her life for her fellow officer. "Don't come in. He's got my gun. He's got my gun." Don't you think that she deserves some kind of justice. That's courage to give up your life for a fellow human being. "Don't *Page 482 
come in. He's got my gun. He's got my gun."
 It's not a law of the jungle or survival of the fittest — if it was we wouldn't need police officers and that man would be running his country, people like him. (emphasis added)
Appellant asserts that the underlined portions of the above statements evince the racial prejudice placed before the jury by the State. However, when read in the proper context the above statements simply describe how a police officer, on duty, and answering a call, was cruelly killed, and that the only reason for law enforcement to exist is to prevent such conduct. Only the super sensitive would construe the above remarks as an attempt by the prosecutor to inflame the passion and prejudice of the jury against Lanier. See Craft v. State, 226 Miss. 426, 84 So.2d 531
(1956).
Next, appellant contends that the prosecutor erred in continuously repeating to the jury that when Lanier would answer questions asked by the police on the night of Walters' shooting that Lanier would answer with, "You Dig." Further appellant makes the far-fetched argument that he was prejudiced by the State referring to him simply as "Lanier" instead of "Mr. Lanier." In both instances if there were any error it was harmless error.See Carleton v. State, 425 So.2d 1036 (Miss. 1983); Forrest v.State, 335 So.2d 900 (Miss. 1976). The record is replete with instances of the prosecutor referring to appellant as "Mr. Lanier." The contention is meritless.
 2. DID THE STATE'S NUMEROUS REFERENCES TO ALMA WALTERS' PERSONAL QUALITIES AND THE SUFFERING OF HER FAMILY UNFAIRLY PREJUDICE THE JURY IN VIOLATION OF LANIER'S EIGHTH AND FOURTEENTH AMENDMENT RIGHTS?
During the course of the sentencing phase, the prosecutor made several remarks about Officer Walters' personal life and her family's loss. Appellant argues that because the State focused the jury's attention on an arbitrary factor, sympathy, i.e. a "victim impact" statement, that the sentencing phase of the trial below must be reversed. Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987).
During cross-examination of Lanier's mother the following questions were posed by the State:
 Q. Did you know that she [the victim] had a mother? Did you know that?
 Q. You knew that she had a mother sitting right out here. Did you know that?
 . . . . .
 Q. Did you know that Alma Walters had a brother? Did you know that?
 . . . . .
 Q. And, you knew she was active in her church, didn't you?
 . . . . .
 Q. And — but you knew that she had loved ones, too, didn't you?
No objection was made by defense counsel to this line of questioning. Further, during closing argument the prosecutor remarked, "think of the family of Alma Walters, how they've suffered, what kind of a loss they've taken. Lets not forget them. The friends of this woman, police woman. Think about that." Defense counsel quickly objected on the basis that the suffering of the victim's family was irrelevant to the sentencing phase of the trial, and the lower court sustained counsel's objection. Previously, the trial judge had refused to allow Officer Walters' mother to testify on the same basis; lack of relevancy.
As can be seen above defense counsel objected to the prosecutor's statements now in question in only one instance and the trial court sustained the objection. Thus, it is presumed that the jury disregarded the prosecutor's statement in summation. See Johnson v. State, 475 So.2d 1136 (Miss. 1985);Hubbard v. State, 437 So.2d 430 (Miss. 1983). As to the questioning of Lanier's mother about Walters' family and personal life, no objection was made, and as such the point is waived on appeal. Messer v. State, 483 So.2d 338 (Miss. 1986). The assignment of error is without merit. *Page 483 
 3. DID THE STATE'S INSTRUCTIONS TO THE JURY ON THE LAW DURING CLOSING ARGUMENT REQUIRE REVERSAL OF APPELLANT'S CONVICTION AND SENTENCE?
During closing argument of the guilt/innocence phase in the trial below, the prosecutor made the following comment:
 [T]he truth that they are afraid you will see as a juror that this defendant committed capital murder. The elements of this offense are that he killed a police officer acting in the scope of her duty.
(emphasis added)
Lanier argues on appeal that the above remark amounted to an impermissible instruction by the State on the law. However no contemporaneous objection was made to the above argument and as such it is not preserved for appeal. Gray v. State,487 So.2d 1304 (Miss. 1986); Messer v. State, 483 So.2d 338 (Miss. 1986).
 4. DID THE PROSECUTOR IMPERMISSIBLY REFER TO FACTS NOT IN EVIDENCE AND MISSTATE THE EVIDENCE IN HIS ARGUMENT TO THE JURY?
During the guilt/innocence phase of the trial below, all witnesses, but one, to the events at the Smith house on the night in question testified that they heard only two gunshots come from the house. Only Officer K.D. Merchant testified that he heard a gunshot which would have amounted to a third shot fired in the house. Additionally, the proof at trial showed Officer Walters' died from a "contact" wound to the head, or one in which the barrel of the gun is placed directly against the skin. When Walters' revolver was recovered at the roadblock there were three "live" rounds and three empty cases in the cylinder.
During closing argument, the prosecutor surmised that all witnesses except Officer Merchant heard only the first two shots due to the fact that when the gun was fired the third time it was in contact with Walters' head which muffled the shot. Appellant argues now, as he did at trial, that there was no evidence that the shot could have been muffled, and consequently the prosecutor's argument was erroneous.
Concerning the prosecutor's argument, it is a well established rule that the drawing of an inference from the testimony of a witness is a legitimate practice. Snowden v. State,356 So.2d 1143 (Miss. 1978); Ragan v. State, 318 So.2d 879 (Miss. 1975);Cannon v. State, 190 So.2d 848 (Miss. 1966). As seen above, there were several instances of testimony and evidence upon which the prosecutor could make the inference of a muffled third shot. Lanier's point is without merit.
 C. DID THE INTRODUCTION INTO EVIDENCE AND USE OF THE PHOTOGRAPHS OF ALMA WALTERS' BODY BOTH IN THE GUILT/INNOCENCE AND SENTENCING PHASES IMPAIR JOHNNY LANIER'S RIGHT TO A FAIR TRIAL UNDER THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS?
At trial the State successfully entered into evidence photographs depicting Officer Walters as she was found at the scene of the incident in the early morning hours of December 28, 1985, and depicting the bullet wound to her head as it existed at the time of the autopsy. Appellant argues that the photographs were graphic and inflammatory, and that the lower court erred in allowing such to be viewed by the jury.
In determining whether the photographs of Walters should have been excluded, the proper inquiry is found in Miss.R.Evid. 403 which provides:
 Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.
The determination as to whether photographs are admissible rests within the sound discretion of the trial judge whose decision will be upheld absent a showing of abuse of discretion. Watsonv. State, *Page 484 483 So.2d 1326 (Miss. 1986); Stevens v. State, 458 So.2d 726 (Miss. 1984); Irving v. State, 228 So.2d 266 (Miss. 1969). The mere fact that photographs depict an unpleasant or gruesome scene is no bar to their admission if they are relevant. Dase v. State,356 So.2d 1179 (Miss. 1978).
In the present case, some of the photographs were used in the State's case-in-chief to corroborate the testimony of Officer K.D. Merchant who found the body, and who testified as to the condition of the scene as it existed on the night in question. Other photographs were used in conjunction with the testimony of the physician who did the autopsy of Walters, and who testified that her death was caused by a "contact" wound due to the presence of gas burns from the gunpowder in the cartridge. Further the photographs were used to cross-examine Lanier concerning his defense that the shooting was an accident which occurred while he and Walters struggled for the gun. The proof showed Walters to be right handed, however the gunshot wound was to the left side of her head; almost an impossibility in the context of a struggle. Under the above facts, the photographs were clearly relevant and there was no abuse of discretion on the part of the trial court. Watson, supra; Dase, supra.
Finally, the State utilized the photographs of Walters during closing argument in the sentencing phase. There appears to be no purpose for this conduct other than allowing the jury to once again see the photographs. In Stringer v. State, 500 So.2d 928
(Miss. 1986) we stated that such conduct goes beyond any evidentiary value and is to be deplored. Id. at 935. But, in the present case no contemporaneous objection was made when the prosecutor used the photographs during closing argument, as it was incumbent that defense counsel do. As there was no proper objection made to this use of the photographs the point is not preserved for appeal. Gray v. State, 487 So.2d 1304 (Miss. 1986); Coleman v. State, 378 So.2d 640 (Miss. 1979). The assignment of error is without merit.
 D. DID THE TRIAL JUDGES' LEGAL ERRORS AND MISCONDUCT DEPRIVE JOHNNY LANIER OF HIS RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL AND TO A FAIR TRIAL?
Appellant contends that various actions of the trial judge deprived him of effective assistance of counsel and to a fair trial. In making this argument Lanier points to three specific instances.
 1. DID JUDGE WILLIAMSON'S FAILURE TO RECESS AND ADJOURN AT REASONABLE TIMES DENY LANIER THE EFFECTIVE ASSISTANCE OF COUNSEL?
Prior to trial, the lower court judge ruled that jury proceedings in Lanier's case would be conducted between 8:00 a.m. and 5:00 p.m. daily until concluded. Because this schedule was not strictly adhered to Lanier contends that he was prejudiced.
The record reveals that on the first full day of trial, court commenced at 9:00 a.m. and was adjourned at 6:00 p.m. Defense counsel made a motion to recess at 5:00 p.m. which was denied so that defense counsel could cross examine one of the State's witnesses. A five minute recess was given prior to beginning cross-examination.
On the second full day, a Friday, both sides concluded their proof. At 5:15 p.m., while the judge and attorneys were discussing jury instructions, defense counsel motioned the court to recess for the day, and delay instructing the jury, and presentation of oral argument until the next day. Defense counsel's request was denied. However, when the jury returned to the courtroom the following exchange occurred:
 BY THE COURT:
 Ladies and gentlemen, we still have to have the reading of the instructions by the Court, the closing argument of the attorneys, which will take a maximum of forty-five minutes to the side. Now, we can start the instructions and then the argument this afternoon or in the morning. It doesn't make any difference to me. Are all of you — what is your desire? *Page 485 
 (The jurors have a discussion among themselves at this time)
 BY THE JUROR:
 Your Honor, I believe it unanimous that we do it this afternoon.
After the jury was instructed, and the attorneys' made their closing arguments, the jury retired at 7:15 p.m. At 10:07 p.m. the jury returned its verdict of guilty.
In Fairly v. State, 483 So.2d 345 (Miss. 1986) this Court noted that a prime concern in such cases is whether or not the jury and counsel can continue the proceedings without discomfort or distress. As seen above, the lower court judge undertook to insure that the jury suffered from no such afflictions. As to the condition of defense counsel, the record fails to reveal any evidence of old age, illness, fatigue or exhaustion that effected defense counsel's performance. See Thornton v. State,369 So.2d 505 (Miss. 1979); Edge v. State, 393 So.2d 1337 (Miss. 1981);Parker v. State, 454 So.2d 910 (Miss. 1984). Appellant's point is unfounded.
Finally, Lanier contends that on the last day of the trial, the day on which the sentencing phase was conducted, that the trial court directed the jury that it must determine a sentence on that day. In this regard the following statement was made to the jury by the judge at the opening of the proceeding:
 BY THE COURT:
 You ladies and gentlemen of the jury, I just want to ask if all of you are well and able to listen to evidence and make a decision today? If any of you are not, please hold up your hand. (No response). All right.
Even the closest scrutiny of the above statement could not lead us to conclude that the trial court ordered the jury to reach a decision on that day. As such, Lanier's argument is meritless.
 2. DID THE TRIAL COURT ERR IN FAILING TO READ MOTIONS AND IN RULING ON MOTIONS HE HAD NOT REVIEWED?
Prior to trial, Lanier filed numerous motions with the court below. In hearing the motions, the trial judge revealed that he had not read any of the motions. As a consequence, defense counsel was allowed to read in toto the motions to the judge, and was then given an opportunity to present evidence. Appellant argues that he was prejudiced by the lower court's failure to read motions. However when the above fact that motions were read to the judge by defense counsel is considered, if there was any error it was harmless error.
 3. DID THE TRIAL JUDGE IMPROPERLY CROSS-EXAMINE DEFENSE WITNESSES, INCLUDING JOHNNY LANIER?
Appellant argues that the lower court judge continuously and improperly questioned defense witnesses and in doing so assisted the State in the prosecution of Lanier, and totally departed from his role as a neutral administrator of justice. Lanier points to the following exchange as proof of his contention:
 BY DEFENSE COUNSEL:
 The court is now cross examining this witness in an adversary posture rather than an information posture and we object to it.
 BY THE COURT:
 I had to because the District Attorney is busy with other matters. All right.
In reviewing Lanier's claim, we note that every instance to which he points in the record, where the lower court judge questioned a witness, occurred during the hearing of motions, and prior to a jury being empaneled. The great majority of the questions asked by the judge concerned Lanier's motions for a change of venue, and for an independent psychiatric examination. Further, after "cross examining" witnesses, the lower court did in fact grant a change of venue, but denied an independent psychiatric examination.
In regard to appellant's claim, Rule 614 of the Mississippi Rules of Evidence provides that:
 RULE 614. CALLING AND INTERROGATION OF WITNESSES BY COURT *Page 486 
 (a) Calling by Court. The court may, on its own motion or at the suggestion of a party, call witnesses, and all parties are entitled to cross-examine witnesses thus called.
 (b) Interrogation by Court. The court may interrogate witnesses, whether called by itself or by a party.
 (c) Objections. Objections to the calling of witnesses by the court or to interrogation by it may be made at the time or at the next available opportunity when the jury is not present. (emphasis added)
As can be seen, under Rule 614 a trial judge is given the traditional power to question, or "interrogate", witnesses. However, very recently in West v. State, 519 So.2d 418 (Miss. 1988), we reversed a death sentence where the trial judge, before the jury, interjected himself into the proceedings at some thirty instances so as to strengthen the prosecution's case. Twenty of the instances amounted to the judge "coaching" the district attorney, whereas nine instances resulted from the trial judge questioning witnesses where the State's questions were insufficient. The present case is inherently and totally different from West, supra in that the trial judge's questions were posed so that he could decide whether or not to grant or deny certain motions made by defense counsel prior to trial. Further, the questioning was done prior to the empaneling of the jury. Consequently the trial judge did no more than exercise the authority granted him under Rule 614. The assignment of error is without merit.
 III. SENTENCING PHASE A. WAS THE MAY 20, 1986 MISSISSIPPI STATE HOSPITAL REPORT HEARSAY EVIDENCE IMPROPERLY USED AT SENTENCING TO CROSS-EXAMINE MICHAEL MARTIN, AND FURTHER DID ITS ADMISSION VIOLATE MISSISSIPPI'S EVIDENTIARY RULES AND JOHNNY LANIER'S SIXTH AMENDMENT RIGHTS TO CONFRONT ALL WITNESSES AGAINST HIM?
During the sentencing phase of the trial below, Lanier sought to prove as a mitigating circumstance that the offense was committed while he was under the influence of extreme mental or emotional disturbance. Miss. Code Ann. § 99-19-101 (1972). In this regard, appellant called several family members to testify as to past behavior that exhibited conduct out of the ordinary, such as experiencing hallucinations, talking to telephone poles, and destructive rampages in which Lanier would destroy real and personal property for no apparent reason. Most importantly, Lanier called Michael Martin, the jailer in the Lauderdale County Jail to recount some episodes which he personally observed that demonstrated mental incapacity on the part of Lanier, and to further give his opinion that Lanier needed mental help. On cross-examination, the prosecutor questioned Martin about a May 20, 1986 letter written by two doctors from the Mississippi State Hospital at Whitfield as follows:
 Q. You knew that Mr. Lanier had been sent to the Mississippi State Hospital at Whitfield, didn't you?
 A. Yes, sir.
 Q. You knew that he had been reported on a long history of alcohol and drug abuse.
 A. Yes, sir.
 Q. And, you knew that it was reported by Dr. Helen C. Robinson, PHD, Clinical Psychologist and Mark Lancaster, MD, Director of Forensic Services that they sent a report back to the sheriff's office and that would help you-all in your incarceration of the defendant, didn't you?
 A. Yes, sir.
 Q. And, you looked at that report because you had the responsibility of seeing this man —
 A. Yes, sir.
 Q. And, you saw in that report that he's competent, didn't you?
 BY MR. JORDAN:
 We object to the form of that question. The report is not in evidence. That's not what the report said. *Page 487 
 BY THE COURT:
 Well, he's on cross examination. Both sides have the report. I made it available to you as well as Mr. Wright.
 BY MR. JORDAN:
 Your Honor, we object. It's improper and Mr. Wright knows it's improper.
 BY THE COURT:
 I don't, so I overrule the objection.
 BY MR. JORDAN:
 Your Honor, the comment he's competent — for what? That's not the issue and we object to it, Your Honor. Once again we move for a mistrial.
 BY THE COURT:
 Motion is denied.
 BY MR. WRIGHT:
 Q. You're familiar with that, aren't you, Mr. Martin?
 A. Yes, sir.
 Q. And, you're familiar that it was the staff's unanimous opinion that he knew the difference between right and wrong at this time and at the time on December the 28th, 1985?
 BY MR. JORDAN:
 Your Honor, we object to the form of that question and once again we move for a mistrial.
 BY THE COURT:
 Overruled. If he knows he may answer. If he doesn't he can say so.
 A. Yes, sir.
 BY THE COURT:
 Motion for mistrial is denied, also.
 BY MR. WRIGHT:
 Q. And, you saw in that report, you also saw that they mentioned — the staff at Whitfield — no recommendation for further mental treatment —
 BY MR. JORDAN:
 Your Honor, we object. This is all hearsay. Object to it, Your Honor. It's improper and move for another mistrial.
 BY THE COURT:
 Well, your objection is overruled. Motion for mistrial is overruled. You may answer the question.
 A. Yes, sir.
The Whitfield letter, which was neither entered into evidence nor discussed during the guilt innocence phase of Lanier's trial, was a conclusion by a panel of doctors, based on a court-ordered examination of Lanier prior to trial that he was sane at the time Officer Walters was killed and at the time of trial, and further that Lanier needed no additional medical treatment. Counsel for defendant objected to the State's use of the Whitfield letter on the basis that it was inadmissible hearsay. On appeal, Lanier further alleges that use of the letter was a violation of the confrontation clause of the Sixth Amendment of the United States Constitution.
In regard to Lanier's contention it has been stated that:
 Competency of evidence.
 A party does not have the right, under the guise of cross-examination, to introduce evidence that is wholly irrelevant to the issues nor will he be permitted to introduce evidence which under the rules governing admissibility of evidence is incompetent. Incompetent evidence may not, on cross-examination, be placed before the jury under the guise that it impeaches or discredits the witness, nor may a witness on cross-examination be asked questions calling for merely hearsay evidence. (emphasis added)
81 Am.Jur.2d Witnesses § 47 at 481 (1976). One point bears emphasis at the outset. The prosecution did not use the Whitfield report for impeachment. Rather, the effect (and, we presume, the purpose) of the prosecution's use of the report was to place before the jury a substantive conclusion different from that offered by the witness. This the prosecuting attorney may attempt to do on cross-examination, provided evidence of the conclusion has already been received or he has a well-founded basis for believing he can establish independently the conclusion with which he confronts the witness, see Hosford v. State,525 So.2d 789, 792 (Miss. 1988); Foster v. State, 508 So.2d 1111, 1115 (Miss. 1987), and he later offers such evidence.
Impeachment tests the believability of the witness on any subject. The *Page 488 
conventional methods for impeaching a witness involve showing the interest or bias of the witness, his character, or prior inconsistent statements. By way of contrast, here the prosecution tried to suggest that others (more competent than the witness) disagreed with the witness' conclusion — for the purpose of disproving the witness' conclusion. The cross-examination attacked the weight and worth of the witness' testimony. What the prosecuting attorney did comes close to merely arguing with the witness.
Moffett v. State, 456 So.2d 714 (Miss. 1984) has been miscited in opposition to today's holding. Moffett is wholly inapposite. No doubt a prior inconsistent statement used for impeachment may not be used as substantive evidence. Here, the Whitfield report was not a prior inconsistent statement, nor was it used for impeachment. With this said, the critical question is whether or not the letter was incompetent and impermissible hearsay.
Rule 801 of the Mississippi Rules of Evidence provides:
 "Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.
In the case sub judice, the letter could have been offered only to prove that Lanier was sane at the time of the offense so as to discredit appellant's "mental disturbance" evidence. As it was made out of court, the letter falls directly under the definition of hearsay. Further, there is no exception applicable to the subject letter. In fact, Rule 803(8)(C) provides that "factual findings resulting from an investigation made pursuant to authority granted by law" constitute admissible hearsay only "in civil actions and proceedings and against the state in criminal cases." The comments to the rule specifically note that allowing "the state to use such reports against a defendant would be to create confrontation rights problems." (emphasis added)
The confrontation clause of the Sixth Amendment of the United States Constitution provides that, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." Article 3, Section 26 of the Mississippi Constitution contains an almost identical provision. Further it is stated that:
. . . the crucial question under the confrontation clause is not compliance with common law hearsay rules, but fulfillment of the "mission of the confrontation clause to advance the accuracy of the truth determining process . . . by assuring that the trier of fact has a satisfactory basis for evaluating the truth of a prior statement."
Lafave and Israel, Criminal Procedure § 23.3(d) at 877-878 (1985) quoting California v. Green, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). The right of a criminal defendant, such as Lanier, to cross examine the witnesses against him is at the heart of the confrontation clause, in that cross-examination is "the principal means by which the believability of a witness and the truth of his testimony are tested." Davis v. Alaska,415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). In an early case, the United States Supreme Court emphasized and explained the confrontation clause as follows:
 The primary object of the constitutional provision in question was to prevent depositions or ex parte affidavits . . . being used against the prisoner in lieu of a personal examination and cross-examination of the witness.
Mattox v. United States, 156 U.S. 237, 242, 15 S.Ct. 337, 339, 39 L.Ed. 409 (1895). As previously seen, the manner in which the State utilized the Whitfield letter afforded Lanier no opportunity to cross-examine the conclusions of the several doctors. The letter as previously noted was obviously violative of our hearsay rules. But, over and about the fact that the letter in the present case was inadmissible hearsay, the confrontation clause acts so as to even restrict proof which under our evidence rules would be classified as "admissible hearsay." Lafave and Israel, Criminal Procedure § 23.3(d) at 877.
In Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the United *Page 489 
States Supreme Court stated that the confrontation clause acts in two ways to restrict even the use of admissible hearsay. The first, which is "in conformance with the Framers' preference for face-to-face accusation, the Sixth Amendment establishes a rule of necessity. In the usual case . . . the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant." 448 U.S. at 65, 100 S.Ct. at 2538, 65 L.Ed.2d at 607. Second, once unavailability is shown, "the Clause countenances only hearsay marked with such trustworthiness that `there is no material departure from the reason of the general rule.'" Id. In the case sub judice, the letter was inadmissible hearsay. Further, there was no showing by the State that the doctors participating in Lanier's evaluation were unavailable. To the contrary, obtaining even one of the doctors to testify at trial would have been as simple as the State issuing a subpoena. Simply put, the prosecutor made no effort whatsoever to see that the doctors would be present at trial, so as to afford Lanier his right of cross-examination.
In regard to the particular situation at hand, use at trial of a report arising out of a court-ordered mental examination conducted prior to trial, it is stated:
 § 8. Right to confront and cross-examine witnesses.
 Whether the report of the examining doctors may be admitted into evidence at the trial has been held to depend on the presence of the doctors as witnesses
in the case.
 If the doctors do not testify, it has been held that their report is not admissible, since to admit the report under such circumstances would violate the defendant's right to confront and cross-examine witnesses against him. (Emphasis added)
32 A.L.R.2d Psychiatric Examination § 8 at 452 (1953). InSmith v. State, 200 Ark. 1152, 143 S.W.2d 190 (1942), a criminal defendant was committed, prior to trial to the Arkansas state hospital for observation and investigation as to his sanity at the time of the alleged crime. At trial, Smith introduced evidence showing that he was mentally incompetent and insane. In rebuttal, the state introduced the report from the state hospital which showed Smith to be sane and competent. In reversing Smith's conviction, of assault with intent to kill, the Arkansas Supreme Court opined:
 It was error to admit the introduction of the report of the hospital and the statements contained therein without the witnesses being present and appellant given the opportunity to cross-examine them. (emphasis added)
143 S.W.2d at 193. As in Smith, Lanier was likewise denied the opportunity to cross examine the authors of the Whitfield letter. Further, in reviewing the sentence of death imposed on a criminal defendant wherein a report produced by a state mental facility was utilized to prove sanity, it has been held:
 The trial court offered, in this case, to have process issued for the physician who made the report; and this must be done when objection to the use of the report is made, to comply with the provision of the Constitution above quoted, that the defendant be "confronted with the witnesses against him." However, the report might be offered as original testimony when this is done by consent or without objection.
(emphasis added)
Jones v. State, 204 Ark. 61, 161 S.W.2d 173, 176 (1942). If the Whitfield doctors had previously testified to their findings and conclusions, the prosecutor would have been within his prerogative in asking Martin about those. Yet prior testimony by the doctors was not essential. Assuming a good faith basis for believing he could prove the points, the prosecutor on cross-examination of Martin could ask the same questions. The court had authority to allow the questions on condition that the prosecution later offer proof of the substantive evidence embodied in the question. Rule 104(b), Miss.R.Ev. Had the court so ruled, the prosecution would have then had the burden of supplying the condition through admissible evidence, i.e., by calling the Whitfield doctors as witnesses. This *Page 490 
was not done, and herein lies the core reason why we hold the trial court in error.
 B. SHOULD THE AGGRAVATING CIRCUMSTANCES OF AVOIDING ARREST AND DISRUPTING OR HINDERING THE LAWFUL EXERCISE OF ANY GOVERNMENTAL FUNCTION OR THE ENFORCEMENT OF LAW HAVE BEEN SUBMITTED TO THE JURY BECAUSE ALMA WALTERS DID NOT LAWFULLY ARREST JOHNNY LANIER?
Lanier argues that the lower court erroneously submitted to the jury, as a part of the sentencing phase, the aggravating circumstances of avoiding arrest and hindering the lawful exercise of any governmental function or the enforcement of law. In this regard, § 99-19-101 sets out, in pertinent part, the aggravating circumstances that may be considered as follows:
 (5) Aggravating circumstances shall be limited to the following:
 (e) The capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.
 (g) The capital offense was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws.
Lanier sounds this argument in the fact that at trial he testified that on the night in question Officer Walters awakened him in the Smith house. She then escorted him to the front yard so that he could get some fresh air and cool off. Once outside, Lanier testified, Walters placed him under arrest for public drunkenness. Appellant now contends that since his testimony was the only direct testimony of what happened in the front yard on the fatal night, and as a public drunkenness arrest under the above facts would amount to an illegal arrest, that the lower court erred in submitting to the jury the enumerated aggravating circumstances under § 99-19-101(5)(e) and (g).
A close analogy can be drawn to appellant's argument in this Court's familiar Weathersby rule. Under this doctrine, where a defendant or his witnesses are the only witnesses to a homicide, their version, if reasonable, must be accepted as true, "unless substantially contradicted in material particulars by a credible witness or witnesses for the State, or by the physical facts or by the facts of common knowledge." Weathersby v. State,165 Miss. 207, 209, 147 So. 481, 482 (1933). Recently, the above rule was clarified as being nothing more than a statement of the general principle that the hypothetical "reasonable" juror must have some material evidence, contradictory to defendant's version, upon which a verdict of guilty beyond a reasonable doubt could be found. Wetz v. State, 503 So.2d 803, 808-809 (Miss. 1987); Harveston v. State, 493 So.2d 365, 371 (Miss. 1986). Thus the question becomes whether or not there was any credible evidence upon which the jury could find the aggravating circumstances in question, contradictory to Lanier's version.
The record reflects that Officer Walters was dispatched to the Smith house on a domestic disturbance call. Catherine Smith met Walters outside of the house and conveyed to Walters that Lanier had pushed her out of the house. After arousing Lanier, and immediately preceding the altercation between Walters and Lanier outside, Smith advised Walters that appellant had been beating her up and that she wanted him out of her house. Further, during the process of the fight that ensued, with appellant on top of Walters, Smith overheard Walters asking Lanier to discontinue his conduct. Under these facts, it is reasonable to conclude that the jury could infer that Lanier attacked Walters to avoid or prevent his lawful arrest under several circumstances. § 99-19-101(5)(e). Even more convincing is that the above facts definitely point to Lanier acting so as to, "hinder the lawful exercise of any governmental function or the enforcement of laws." §99-19-101(5)(g). Accordingly, the lower court did not err in submitting these aggravating circumstances to the jury for its consideration, which were properly found. *Page 491 
 C. IS THE "ESPECIALLY HEINOUS, ATROCIOUS OR CRUEL" AGGRAVATING CIRCUMSTANCE OF MISS. CODE ANN. § 99-19-101(5)(h) UNCONSTITUTIONALLY VAGUE AND OTHERWISE INAPPLICABLE?
Miss. Code Ann. § 99-19-101(5)(h) (1972) provides as an aggravating circumstance in the sentencing phase of a capital murder case the following:
 (5) Aggravating circumstances shall be limited to the following:
 (h) The capital offense was especially heinous, atrocious or cruel.
The trial court instructed the jury pursuant to §99-19-101(5)(h). Appellant first contends that the above aggravating circumstance is unconstitutionally vague and that the lower court erred when it refused to instruct the jury as to the meaning of "especially heinous, atrocious or cruel". In line with the recent United States Supreme Court decision in Maynard v.Cartwright, 486 U.S. ___, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), on remand the jury should be given a limiting instruction as to the meaning of "especially heinous, atrocious or cruel". The lower court may refer to our decisions in Mhoon v. State,464 So.2d 77 (Miss. 1985); Billiot v. State, 454 So.2d 445
(Miss. 1984); Coleman v. State, 378 So.2d 640 (Miss. 1979);Washington v. State, 361 So.2d 61 (Miss. 1978), for our construction of the words "especially heinous, atrocious or cruel".
 D. DOES THE INVALIDITY OF A SINGLE AGGRAVATING CIRCUMSTANCE IN THIS CASE ENTITLE LANIER TO A NEW SENTENCING HEARING?
Appellant argues that if one aggravating circumstance of the three found by the jury below is determined on appeal to be invalid, that a new sentencing hearing must be ordered. In this regard, this Court has embraced the United States Supreme Court's decision and reasoning in Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), that where the jury's death penalty determination is based upon several aggravating circumstances, the invalidity of one of these circumstances will not constitutionally impair the sentence. Lockett v. State,517 So.2d 1317, 1336 (Miss. 1987); Johnson v. State,511 So.2d 1333, 1338 (Miss. 1987); Stringer v. State, 500 So.2d 928, 945 (Miss. 1986). On this point of law, appellant's contention is unfounded. Further, as seen under Sections III(B) and (C)supra, none of the aggravating circumstances, as found by the jury, was invalid. Consequently, the assignment of error is without merit.
 E. DOES THE JURY'S REFUSAL TO FIND AT SENTENCING THAT JOHNNY LANIER INTENDED TO KILL THE DECEDENT REQUIRE REVERSAL OF JOHNNY LANIER'S CONVICTION FOR CAPITAL MURDER?
Miss. Code Ann. § 99-19-101 provides that:
 (7) In order to return and impose a sentence of death the jury must make a written finding of one or more of the following:
 (a) the defendant actually killed;
 (b) the defendant attempted to kill;
 (c) the defendant intended that a killing take place;
 (d) the defendant contemplated that lethal force would be employed.
(emphasis added). The above mandated findings were passed in the wake of the United States Supreme Court's decision in Enmund v.Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), in which the court sought to deal with the accomplice/triggerman scenario. In the present case after being instructed on this point, the jury found only the first two of the above enumerated factors to exist. Appellant now argues that as the jury refused to find the third circumstance, that Lanier "intended that the killing Alma Walters take place," and as it must have found such in the guilt/innocence stage, that the jury "reversed its original conclusions," and that there is "no way this Court can have any confidence in the jury's capital murder verdict." *Page 492 
In reaching a determination concerning Lanier's argument, we first note that § 99-19-101(7) provides that the jury must find only one of the circumstances set out, and that the jury below found two enumerated circumstances to exist. Further, theEnmund decision requires only that any one of the proscribed elements must exist. Williams v. State, 445 So.2d 798 (Miss. 1984). Finally, the present case does not, without the statutory mandate, fall within the accomplice/triggerman scenario contemplated by Enmund. If the jury had wanted to reverse its earlier decision as to Lanier's guilt, it was free to elect not to impose the death penalty. Lanier's argument is meritless.
 F. IS THE SENTENCE OF DEATH IN THIS CASE UTTERLY DISPROPORTIONATE TO JOHNNY LANIER'S CULPABILITY IN LIGHT OF HIS MENTAL INCAPACITY, RETARDATION, AND CHRONIC ALCOHOL AND DRUG ABUSE, AND OF THE CONCEPTS OF DECENCY INHERENT IN THE EIGHTH AMENDMENT AND IN OUR SOCIETY AS A WHOLE?
Miss. Code Ann. § 99-19-105(3)(c) (1972) directs this Court, in death penalty cases to consider, "Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Appellant argues that the imposition of the death penalty is improper in the present case due to the fact that he has an IQ of 61, has been plagued in the past with experiencing hallucinations ranging from demons to elephants, has gone on destructive rampages, has on two prior occasions been placed in mental institutions, and because he is an alcoholic and a chronic drug abuser. In making this argument, Lanier principally relies uponEdwards v. State, 441 So.2d 84 (Miss. 1983).
In Edwards, a plurality of this Court determined the imposition of the death penalty to be disproportionate where the criminal defendant was a seriously and dangerously mentally ill person, with a long history of schizophrenia of a paranoid type. 441 So.2d at 93. In the case of Johnny Lanier, although his IQ of 61 indicates "mild mental retardation" and there is proof of hallucinations in the past, this would not rise to the same level as the severe mental disease found in the Edwards case.
The evidence presented concerning Lanier's mental condition comports more readily with that found in Neal v. State,451 So.2d 743 (Miss. 1984). In Neal, the defendant had an IQ of 54 and suffered from various mental deficiencies not arising to the severe mental disease found in Edwards, supra. In affirming the decision of the lower court, we held that mild mental retardation creates no per se bar to execution. 451 So.2d at 762. This same reasoning was followed in Jones v. State, 517 So.2d 1295 (Miss. 1987). As Lanier suffers only from minor mental disabilities, if from any at all, his sentence is not excessive or disproportionate to the penalty imposed in similar cases.
Finally, § 99-19-105(3)(a) mandates that this Court shall determine, "Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor." A thorough review of the record reveals that none of these factors entered into the jury's imposition of the death penalty. The assignment of error is without merit.
 CONCLUSION
As the prosecution, under Section III(A), supra, improperly used Lanier's Whitfield psychiatric examination to cross examine defense witness Martin during the sentencing phase, in violation of the Sixth Amendment of the United States Constitution, the sentencing phase of the trial is reversed and remanded. There being no error in the guilt/innocence phase, the jury's verdict of "guilty" is affirmed.
AFFIRMED AS TO THE VERDICT OF GUILTY; REVERSED AND REMANDED FOR A NEW SENTENCING HEARING.
HAWKINS, P.J., and PRATHER, ROBERTSON, SULLIVAN and ANDERSON, JJ., concur. *Page 493 
DAN M. LEE, P.J., ROY NOBLE LEE, C.J., and GRIFFIN, J., dissent only as to part III.A by separate written opinion.